Argued and submitted June 23, reversed and remanded September 10, 1997

Diane MARCONI,
an individual,
*Appellant,*

*v.*

GUARDIAN MANAGEMENT CORPORATION,
an Oregon corporation,
*Respondent.*

(9409-06737; CA A90658)

945 P2d 86

Roger Hennagin argued the cause and filed the briefs for appellant.

Jonathan T. Harnish argued the cause for respondent. On the brief were Francis T. Barnwell and Bullard, Korshoj, Smith & Jernstedt.

Albert J. Bannon filed a brief *amicus curiae* for Epilepsy Association of Oregon.

Before Riggs, Presiding Judge, and Landau and Leeson, Judges.

RIGGS, P. J.

## RIGGS, P. J.

Plaintiff brought this claim for employment discrimination against her former employer, Guardian Management Corporation (Guardian), alleging that she was terminated because of a disability in violation of ORS 659.425. At the close of plaintiff's case, the trial court directed a verdict in favor of Guardian. We reverse and remand.

A directed verdict against a plaintiff for failure to establish a claim is only appropriate if "the evidence, viewed in the light most favorable to the plaintiff, is insufficient to support a recovery." *Mauri v. Smith*, 324 Or 476, 479, 929 P2d 307 (1996), *quoting Ream v. Keen*, 314 Or 370, 373 n 2, 838 P2d 1073 (1992). Such a motion "is properly denied if *any* allegation is supported by the evidence." *Whinston v. Kaiser Foundation Hospital*, 309 Or 350, 360, 788 P2d 428 (1990) (emphasis in original). On appeal, we review for errors of law, viewing the evidence in the light most favorable to the party against whom the directed verdict was entered. *Mauri*, 324 Or at 479.

The evidence, stated in the light most favorable to plaintiff, was as follows. Plaintiff had her first epileptic seizure when she was 21 years old. She completely blacked out and did not know where she was when she regained consciousness. She was diagnosed with epilepsy shortly thereafter. Since that time, plaintiff has constantly been on prescription medications to control her seizures. The frequency of plaintiff's seizures has increased over the years. Plaintiff experiences two types of seizures. One type of seizure starts with a feeling in the pit of her stomach, followed by perceptual changes, followed by a blackout. Another type of seizure begins with a panicky or light-headed feeling, followed by a blackout. Two or three seizures a day are common, and sometimes plaintiff has as many as seven seizures a day. The seizures affect plaintiff's memory. The seizures last between 30 seconds and several minutes, during which she has no awareness, although her eyes remain open. After a seizure, plaintiff's awareness returns gradually, and she may remain foggy and confused up to a half an hour after the seizure.

In August 1992, plaintiff was hired as the executive secretary to Barry Brenneke, the president of defendant Guardian. Her first interview was with Kathleen Brainard, who described the job to her. Her second interview was with Susan Brenneke, who was in charge of the secretarial staff. The position was described to plaintiff as a general secretarial position. Plaintiff was supervised by Brainard. Plaintiff's normal work hours were 8:30 to 5:00. She did typing, answered telephones, and handled various tasks for Barry Brenneke. She used a computer for word processing and to retrieve reports. Barry Brenneke indicated that he was very happy with plaintiff's work. In October 1992, Susan Brenneke wrote a note to Brainard stating that plaintiff's work was "excellent and without a flaw." In March, May and June 1993, Barry Brenneke wrote plaintiff notes thanking her and complimenting her work.

Shortly after she was hired, plaintiff told Brainard of her seizures. Brainard seemed sympathetic and understanding. Barry and Susan Brenneke also were aware of plaintiff's seizures. At one point, plaintiff had a seizure while she was speaking on the telephone to Barry Brenneke, and he had to call on another line to a secretary who worked nearby to find out if plaintiff was all right. On another occasion, plaintiff had a seizure while on the telephone with Susan Brenneke. In May 1993, plaintiff was prescribed a new experimental drug for seizure control, and participated in a study of that drug. On May 20, 1993, she informed Barry Brenneke of her participation in the drug study. As part of this experimental program, plaintiff needed to go to doctor's appointments once or twice a week. Plaintiff asked Brainard for flexible or alternative work hours, but Brainard did not respond to her request. Plaintiff stayed late to make up the hours she missed. Brainard told plaintiff that she did not want plaintiff working late, and pressured her to leave at 5:00. The doctor's appointments affected plaintiff's ability to complete her work in a timely manner. During the summer of 1993, Brainard's attitude toward plaintiff changed, and she began coming to plaintiff more frequently to check her work. Plaintiff felt that both Brainard and Susan Brenneke thought that it was an imposition on them that plaintiff had to go to her doctor's

appointments. Also during this time period, plaintiff's seizures increased.

On October 1, 1993, Brainard told plaintiff that she was being terminated because she lacked accounting skills. Brainard told plaintiff that Barry Brenneke was going to be needing someone who could do more accounting, and they had considered training plaintiff to do that work, but they were afraid to give plaintiff the work because of her health. Plaintiff's epilepsy was discussed during this conversation. After this conversation, plaintiff called Barry Brenneke, who told her that he was totally happy with her work, but that he had no control over the secretarial staff, and that Susan Brenneke was "difficult." Later, Brainard and Susan Brenneke offered plaintiff severance pay in exchange for signing a release stating that she would not sue the company for discrimination. Although plaintiff refused to sign the release, Susan Brenneke gave her severance pay anyway.

After plaintiff was fired, Guardian hired Sarah Wickham to replace her. Wickham was not asked during the interview about accounting experience, nor was she given any accounting work while she was employed by defendant. Wickham testified that Susan Brenneke had no tolerance for people who missed work due to illness.

Cristel Taylor, who was employed by defendant as an accounting assistant from October 1992 to November 1994, testified that she heard Susan Brenneke make negative comments about employees who missed work due to illness.

Angela Wehage, who was employed by defendant as a receptionist from January 1992 to March 1994, testified that she heard Susan Brenneke make snide remarks about employees who missed work due to illness. Wehage further testified that after plaintiff's termination, Brainard told her that Susan Brenneke was upset that plaintiff had taken time off for the experimental drug program, that plaintiff had been fired due to her epilepsy, and that Brainard had not wanted to fire plaintiff but had no choice.

Brainard and Susan Brenneke denied that plaintiff's discharge was due to disability, and testified that they had

been dissatisfied with her work all along. Susan Brenneke denied making comments about employees missing work due to illness. Brainard denied telling Wehage that plaintiff was fired due to her epilepsy. Brainard denied telling plaintiff during the meeting at which she terminated plaintiff that they did not want to train plaintiff in accounting due to plaintiff's health. Several former employees of defendant testified that Susan Brenneke had a bad reputation for truthfulness and honesty.

At the close of plaintiff's evidence, defendant moved for a directed verdict, arguing that plaintiff had not produced sufficient evidence that she was discharged because of an actual disability or because defendant perceived plaintiff as having an actual disability. The trial court directed a verdict for defendant on the ground that plaintiff's epilepsy was not a disability for purposes of ORS 659.425 because it did not substantially limit a major life activity, and on the ground that there was no evidence that plaintiff was treated by a supervisor or employer as having a disability that substantially limited a major life activity.

On appeal, plaintiff asserts that the trial court erred in holding that plaintiff had presented insufficient evidence that she had a disability that substantially limited major life activities, and in holding that plaintiff had presented insufficient evidence that, regardless of the existence of an actual disability, she had been treated by Guardian as having such an impairment. For the following reasons, we agree with plaintiff.

It is "the public policy of Oregon to guarantee disabled persons the fullest possible participation in the social and economic life of the state, [and] to engage in remunerative employment[.]" ORS 659.405(1). This policy is carried out, in part, through ORS 659.425(1), which provides:

> "For purposes of ORS 659.400 to 659.460, it is an unlawful employment practice for any employer to refuse to hire, employ or promote, to bar or discharge from employment or to discriminate in compensation or in terms, conditions or privileges of employment because:
>
> "(a) An individual has a physical or mental impairment which, with reasonable accommodation by the

employer, does not prevent the performance of the work involved;

"(b)   An individual has a record of a physical or mental impairment; or

"(c)   An individual is regarded as having a physical or mental impairment."[1]

The first question before us is whether plaintiff produced sufficient evidence that she has a physical or mental impairment covered by ORS 659.425. Defendant does not dispute that plaintiff has epilepsy and does not contend that epilepsy is not a "physical or mental impairment," but argues that the epilepsy was not severe enough to "substantially limit[ ] one or more major life activities."

We turn first to the text and context of the statute. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). The relationship between the text of ORS 659.425(1), which contains the phrase "physical or mental impairment," and the definition of "disabled person" found in ORS 659.400(1), which contains the limitation that the physical or mental impairment must "substantially limit one or more major life activities," is not immediately apparent. However, in *OSCI v. Bureau of Labor and Industries*, 98 Or App 548, 552-54, 780 P2d 743 (1989), this court held that the

---

[1] ORS 659.400 provides the following definitions:

"(1) 'Disabled person' means a person who has a physical or mental impairment which substantially limits one or more major life activities, has a record of such an impairment or is regarded as having such an impairment.

"(2) As used in subsection (1) of this section:

"(a) 'Major life activity' includes, but is not limited to self-care, ambulation, communication, transportation, education, socialization, employment and ability to acquire, rent or maintain property.

"(b) 'Has a record of such an impairment' means has a history of, or has been misclassified as having such an impairment.

"(c) 'Is regarded as having an impairment' means that the individual:

"(A) Has a physical or mental impairment that does not substantially limit major life activities but is treated by an employer or supervisor as having such a limitation;

"(B) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitude of others toward such impairment; or

"(C) Has no physical or mental impairment but is treated by an employer or supervisor as having an impairment."

operative definition contained in ORS 659.400 containing the "major life activities" limitation applied to ORS 659.425.[2] Thus, the question is whether plaintiff demonstrated that her epilepsy substantially limits one or more major life activities. ORS 659.400(1). The definition of "major life activity" found in ORS 659.400(2) is open-ended. As relevant here, that definition provides that ambulation, communication and socialization are major life activities. It is undisputed that plaintiff blacks out during her seizures; at those times, she is unable to engage in ambulation, communication or socialization. In ruling that plaintiff was not entitled to protection under ORS 659.425, the trial court stated: "I don't accept the argument that when [plaintiff] momentarily stopped talking or momentarily stopped walking that that would be a substantial limit on a major life activity." Thus, the trial court's ruling appears to have been based on the relatively short duration of each individual seizure.

■ ■   We disagree with the trial court's conclusion that, because the epileptic seizures described in this record are relatively short in duration, they do not "substantially limit" major life activities. This plaintiff experienced as many as seven epileptic seizures a day throughout her adult life. While these seizures result in only brief periods of blackout, they are followed by significant periods of disorientation. Plaintiff requires medication to control the seizures. A number of plaintiff's major life activities have been affected by her seizure disorder. As noted above, plaintiff is unable to walk, talk, or interact in any way when she is experiencing a seizure. Evidence was presented that plaintiff was unable to speak with Barry and Susan Brenneke over the telephone during seizures. Plaintiff testified that her seizures have affected socialization and her home life as well. Plaintiff's major life activities are not merely substantially limited by her condition, but her activities are almost entirely curtailed during the brief periods when plaintiff is experiencing an epileptic seizure. Plaintiff is seriously impaired during her seizures, and continues to be moderately impaired for up to a half an hour afterward. We conclude that epileptic seizures

---

[2] The definition was found in a different subsection of ORS 659.400 at that point, and the term "handicapped," rather than the term "disabled," was used. The definition, however, was substantively the same as it is now.

such as those experienced by plaintiff are an "impairment," as that term is used in ORS 659.425. The trial court erred in concluding that plaintiff was not a "disabled person" for purposes of ORS 659.400(1).

The trial court also found that plaintiff had presented no evidence that she was discriminated against because she was regarded as having a disability.[3] *See* ORS 659.425(1)(c). ORS 659.400(2)(c) provides, in part:

" 'Is regarded as having an impairment' means that the individual:

"(A)   Has a physical or mental impairment that does not substantially limit major life activities but is treated by an employer or supervisor as having such a limitation[.]"

The trial court quoted that provision, then stated:

"As I understand this particular section of the statute, that would include the period that she was employed; in other words, during the course of her employment, she was treated by a supervisor or employer as having such a limitation. And I don't find that there was evidence on the record to show that so I would not be able to instruct the jury as to that."

■     We disagree with the trial court's conclusion that no evidence demonstrated that plaintiff was treated by her employer or supervisor as having such a limitation. Plaintiff testified that Brainard told her at the time she was terminated that consideration had been given to training plaintiff for the new accounting duties that allegedly were going to become part of the job, but that they chose not to train plaintiff due to her health. Wehage testified that Brainard told her that plaintiff "was fired because she had epilepsy." It is difficult to understand, in the light of that testimony, how the trial court could have concluded that there was no evidence that defendant treated plaintiff as having an impairment.

---

[3] Plaintiff was not required to demonstrate both that she actually had a disability as defined in ORS 659.400(1) and that she was regarded by her employer as having such a disability; proof of either theory would suffice. *See Whinston v. Kaiser Foundation Hospital*, 309 Or 350, 360, 788 P2d 428 (1990) (directed verdict motion must be denied "if *any* allegation is supported by the evidence"). However, we address this issue because the trial court indicated, as noted below, that it would not instruct the jury on this theory of recovery.

While it is true that Brainard denied having made those statements, the trial court was required to view the evidence in the light most favorable to plaintiff for purposes of a directed verdict. The trial court erred in concluding that plaintiff had presented insufficient evidence that she was fired because defendant regarded her as having a physical or mental impairment.

Defendant next argues that the directed verdict in its favor was nonetheless appropriate because plaintiff did not demonstrate that she could perform the work involved with reasonable accommodation from the employer, ORS 659.425(1), and because she did not demonstrate that defendant had a discriminatory motive.

As to the first point, plaintiff presented evidence that Barry Brenneke was happy with her work and that her difficulties completing her work were due to her doctor's appointments and not being allowed to make up the missed work after 5:00. She requested accommodation in the form of flexible work hours, and that request was not granted. Plaintiff presented evidence that she could have performed the work, had she been provided with reasonable accommodation by defendant. Defendant was not entitled to a directed verdict on the ground that plaintiff could not have performed the work with reasonable accommodation.

■■ Finally, defendant argues that it was entitled to a directed verdict because plaintiff presented insufficient evidence that she would not have been fired but for the employer's discriminatory motive. The premise of defendant's argument is that even if there was proof of a discriminatory motive, it could prevail by showing that it also had a legitimate motive. Assuming for the sake of argument that "mixed motive" jurisprudence set forth in federal cases applies under Oregon law, defendant has not demonstrated a "mixed motive." In *McCall v. Dynic USA Corp.*, 138 Or App 1, 7-8, 906 P2d 295 (1995), this court described the "mixed motive" analysis, noting that, under that line of cases, plaintiffs who demonstrate that they would not have been fired but for an unlawful discriminatory motive can under some circumstances prevail despite an employer's legitimate reason for termination, but determining that no "mixed motive" was

properly presented in that case. *Id.* at 8. *See also Callan v. Confed. of Oreg. Sch. Adm.*, 79 Or App 73, 76-78, 717 P2d 1252 (1986) (casting doubt on whether federal mixed motive case law applies under ORS chapter 659, but concluding that mixed motive would not apply under the circumstances anyway). In both *McCall* and *Callan*, we reasoned that the mixed motive rubic could not be invoked where the supposed alternative motive was simply a duplication of the discriminatory motive under a different label. The same is true here. Defendant argues that, because plaintiff was having difficulty keeping up with the workload, it had a legitimate and nondiscriminatory reason to terminate her employment, regardless of whether it was motivated to do so in part by her disability. In this context, however, defendant's suggested reason for terminating plaintiff is neither "legitimate" nor "nondiscriminatory." Defendant argues, in essence, that because plaintiff could not satisfactorily perform her work *without* reasonable accommodation of her disability, it was not discriminating by firing her. The plain language of ORS 659.425(1), however, prohibits discrimination on the basis of an impairment "which, *with* reasonable accommodation by the employer, does not prevent the performance of the work involved." (Emphasis supplied.) Defendant was not entitled to a directed verdict on the basis of this theory.

Plaintiff presented evidence that the individual who fired her told another individual that plaintiff was fired because she had epilepsy. There was evidence that she was fired for missing too much work for doctor's appointments, that she was not allowed to make up the time missed for doctor's appointments although she requested that accommodation, and that Susan Brenneke was intolerant of employees who had health problems. Plaintiff presented evidence that the reason she was given for her termination—that defendant needed to replace her with someone with accounting skills—was a sham. Sufficient evidence was presented to survive a motion for a directed verdict.

Defendant's cross-assignment of error, that the trial court erred in denying its motion for summary judgment based on the same arguments that defendant made at the directed verdict stage, does not require discussion.

Reversed and remanded.