**Emily SNEAD, Plaintiff–Appellant,**

v.

**METROPOLITAN PROPERTY & CASUALTY INSURANCE COMPANY, a Delaware Corporation; James McIntosh, Defendants–Appellees.**

**No. 99–35071.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 4, 2000

Filed Jan. 23, 2001

---

Scott N. Hunt, Esq., Busse & Hunt, Portland, Oregon, for the plaintiff-appellant.

Andrew M. Altschul, Esq., Stoel Rives, Portland, Oregon, for the defendants-appellees.

Before: LAY,\* TASHIMA, and McKEOWN, Circuit Judges.

Opinion by Judge TASHIMA; Dissent by Judge LAY

TASHIMA, Circuit Judge:

The underlying question we must decide in this employment discrimination case arising under Oregon law is whether plaintiff Emily Snead ("Snead") adduced sufficient evidence to survive her employer's, Metropolitan Property and Casualty Insurance Company's ("Met"), motion for summary judgment. We must first decide, however, the threshold question of whether this action is governed by Oregon's special summary judgment procedure applicable to employment discrimination cases or by federal summary judgment rules and procedures.

---

\* The Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

## I. BACKGROUND

Met is engaged in the sale of home and auto insurance through agents known as Property and Casualty Specialists ("PCS"). These agents, in turn, report to Market Development Managers ("MDM"). Each MDM is responsible for managing 15 to 20 PCS agents. In the Portland market, Met originally hired two MDMs: Snead and Bill Todd. Both reported to James McIntosh, Vice President of the PCS organization. While Snead handled the "Portland North" territory, Todd was assigned to the "Portland South" territory. By 1993, Snead and Todd together managed 33 PCS agents.

In early 1995, Snead was being stalked by one of Met's former employees. She claimed that through the use of the mail and telephone, that former employee harassed and threatened her. She also claims that Met handled the matter poorly, offered little help, and even made light of the situation.[1] As a result, she claimed that she suffered emotional distress, which was diagnosed as "Post–Traumatic Stress Disorder and Depression."

After being so diagnosed, Snead sought and was granted a three-month leave of absence, which included a salary continuation under Met's short-term disability program. Snead ultimately extended her request to six months, which was also approved. When Met received Snead's request for an extension, Todd was assigned responsibility for Snead's territory. For administrative convenience, this change was reflected on paper by combining Portland North and Portland South into one market. Although Gary Max, a PCS employee, filled in for Snead, no one was ever hired to replace Snead.

After her short-term disability leave expired, Snead did not return to work. Instead, she went on long-term disability leave. In mid–1996, more than a year after Snead first went on disability leave, Met sent her a letter stating that her long-term disability benefits would end in December 1996, unless she provided medical documentation that she was still disabled. The decision to terminate her long-term disability benefits was partially based on the opinion of Dr. Robert Slack, a Board certified psychiatrist, who opined that, given the stalking incident, "[h]er refusal to return to work is understandable," but that she could still function in other work settings. Snead failed to provide the requested additional information, and thus her disability benefits ended on December 31, 1996. She subsequently faxed McIntosh a medical release stating that she could return to work without any restrictions on February 24, 1997.

Snead expected to be reinstated in her old position. Met's Resources Handbook for Managers states that: "An employee returning from disability will be placed in the job they occupied prior to the disability. An employee returning from a leave of absence may be placed in the same job occupied before the leave of absence or in a reasonably equivalent position at the same salary and rate of pay." But, while Snead was on leave, the staff of Met's Portland office decreased from 33 employ-

1. It is undisputed, however, that Met paid to have caller ID installed on her office telephone, installed a security system in her office, paid a bodyguard, and allowed her to bring a concealed handgun to work. Also, once the stalker was identified as a former employee (David James) whom Snead had terminated, Met not only paid for Snead's defense in a lawsuit brought by James against Met and Snead, but also paid to prosecute Snead's counterclaim, which resulted in a restraining order against James and a money settlement to Snead. Coincidentally, the James lawsuit was settled exactly as Snead began her disability leave in March 1995. Nevertheless, Snead filed a lawsuit against Met in September 1995, claiming intentional infliction of severe emotional distress and reckless infliction of emotional distress. Snead alleged that Met failed to take appropriate action in response to the stalking and death threats that she suffered. The district court dismissed Snead's suit against Met, which was affirmed by the Ninth Circuit. *See Snead v. Metropolitan Prop. & Cas. Ins. Co.,* 909 F.Supp. 775 (D.Or.1996), *aff'd,* 116 F.3d 486 (9th Cir.1997) (Table), 1997 WL 345606.

ees in 1993 to 10 in January 1997. Consequently, Met no longer needed two MDMs in the Portland market (or in any market in the United States). As a result, in mid-January 1997, McIntosh called Snead to tell her that her MDM position no longer existed and to discuss her future in the company. Snead and McIntosh disagree about what was said in that conversation. According to Snead, they discussed the possibility that Snead could be moved to another job (local or otherwise), but that she needed specifics about the job and the compensation. On the other hand, McIntosh testified that Snead indicated to him that she was not mobile and did not want to be a PCS agent.

On January 21, 1997, McIntosh sent Michael Dineen, a Human Resources representative, an e-mail about his conversation with Snead, stating:

> I told her that the PCS program has undergone major changes and that there is not a MDM position available in Portland at this time. I did inform her that there might be a MDM position in another market and asked her if she is mobile. She informed me that she is not. She also has no intentions of becoming a PCS. She basically expected a comparable position at the same salary rate, with bonuses, AND be able to work out of her home. I again stated that we have no desire to grow the market to require additional management.[2]

McIntosh and Bill Moore, Vice President of Sales, also discussed Snead's position and the need to eliminate one of the Portland MDMs. According to Snead, however, this was the first time that McIntosh

discussed that need with Moore (his superior) who until the time of Snead's call, had expected her to return to her old position.[3] Nonetheless, Moore agreed with McIntosh's decision to reduce the number of MDMs in the Portland market.

On February 14, 1997, McIntosh wrote to Snead to confirm their earlier conversation and to confirm that the position that she held as MDM was determined to be "excess."[4] The letter stated that Snead could explore a PCS agent position supervised by Todd. Snead would be paid an unspecified "base salary as well as commission." McIntosh's letter also stated that as of February 24, 1997, her status as an "excess employee" made her eligible for "an enhanced separation allowance."[5] Snead's attorney responded on February 20, 1997, stating that Snead was not interested in a demotion to a PCS agent position. Consequently, on March 19, 1997, the Director of Human Resources wrote to Snead to inform her that her discontinuance would be processed effective March 31, 1997, unless Snead communicated to Met that she was interested in a PCS agent position or in relocating. Pending a response, the Human Resources Department drafted a "Job Related Turnaround Document" on March 19, 1997, listing March 31 as the effective date of Snead's termination.

On March 31, 1997, Snead's attorney requested further information regarding the specifics of the PCS agent position. Upon receipt of the request for information, however, Met's attorney stated that "[b]y the time [he] received [Snead's attor-

---

**2.** Snead testified that following their various conversations, McIntosh never gave her the specific information she requested regarding other positions and that he seemed "disinterested." She also testified that Dineen was "condescending" and "demeaning."

**3.** Yet, in a March 21, 1997, letter, Met's counsel stated that "the decision [to eliminate Snead's position] was made in July 1995, while Ms. Snead was on long term disability leave, to manage the Portland market with only one MDM." Although this representation

somewhat contradicts Moore's statements, it is consistent with the administrative change that combined the Portland North and Portland South territories into one market.

**4.** "Excess" is Met's internal term indicating that the position would be eliminated.

**5.** The district court noted that "[o]n February 24, 1997, Met put Snead back on its payroll while discussions continued about possible positions."

ney's] letter of March 31, 1997 it was too late to forward it to [Met] for receipt the same day." Accordingly, Snead's termination took place as scheduled on March 31, 1997. Less than two months later, Met wrote Todd and all the PCS agents in Portland to inform them that they would be laid off as the result of a decision to close the Portland office. Met ultimately terminated Todd in August 1997. There is still one PCS agent in Portland who reports to a MDM in Seattle.

As a result of her termination, Snead commenced this state law disability discrimination case in Oregon state court, claiming violation of § 659.436 of the Oregon Revised Statutes. The case was timely removed to federal court on the basis of diversity of citizenship jurisdiction. The district court granted defendants' motion for summary judgment because Snead failed to establish that she was terminated because of her disability. Snead timely appeals from the judgment. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## II. STANDARD OF REVIEW

■ We review the district court's grant of summary judgment de novo. *See Botosan v. Paul McNally Realty,* 216 F.3d 827, 830 (9th Cir.2000). In so doing, we apply the same standard used by the district court under Federal Rule of Civil Procedure 56(c)-namely, viewing the evidence in the light most favorable to the non-moving party, we must decide whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *See Lopez v. Smith,* 203 F.3d 1122, 1131 (9th Cir.2000) (en banc).

## III. DISCUSSION

### A. The Prima Facie Case

■ Section 659.436 provides that "[i]t is an unlawful employment practice for any employer to ... discharge from employment ... an otherwise qualified person [because such person] is a disabled person." Or.Rev.Stat. § 659.436 (1999). The standard for establishing a prima facie case of discrimination under Oregon law is identical to that used in federal law. *See Henderson v. Jantzen, Inc.,* 79 Or.App. 654, 719 P.2d 1322, 1323–24 (1986); *see also* Or.Rev.Stat. § 659.449 (providing that Oregon's discrimination laws "shall be construed to the extent possible in a manner that is consistent with any similar provision of the federal Americans with Disabilities Act of 1990 ['ADA'], as amended"). Snead alleges that she was terminated because of her disability. Therefore, to establish a prima facie case of discrimination under the ADA she must show that she: (1) is disabled; (2) is qualified; and (3) suffered an adverse employment action because of her disability. *See Sanders v. Arneson Prods., Inc.,* 91 F.3d 1351, 1353 (9th Cir.1996). It is undisputed that Snead was qualified for the job. What is disputed, however, is whether she was disabled and whether she was terminated because of her disability.[6]

### 1. *Disability*

Under Oregon law, a "disabled person" is defined as a person who: (1) "has a physical or mental impairment which substantially limits one or more major life activities;" (2) "has a record of such an impairment;" or (3) "is regarded as having

---

**6.** We are puzzled by the dissent's insistence that this is a reasonable accommodation/interactive process case despite its recognition that "Snead did not ask Met to alter her job in a way that would accommodate her disability. Snead was prepared to return to her MDM position without any modifications to the job as it was before she went on leave. In other words, she simply asked Met for her old job back." Slip op. at 1096. As we recently noted in *Barnett v. U.S. Air, Inc.,* 228 F.3d 1105, 1112 (9th Cir.2000) (en banc), "[t]he interactive process is triggered either by a request for accommodation by a disabled employee or by the employer's recognition of the need for such an accommodation." Here, neither party has raised reasonable accommodation as an issue and both have treated this as a disparate treatment case.

such an impairment." Or.Rev.Stat. § 659.400(1).

### a. *Physical or Mental Impairment*

Under the Oregon regulations, "physical and mental impairments" include "any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." Or. Admin. R. 839–006–0205(3) (2000). Within the statutory scheme, "substantially limits" means that "[t]he impairment renders the person unable to perform a major life activity that the average person in the general population can perform." [7] Or.Rev.Stat. § 659.400(2)(d)(A). The definition of "major life activity" includes employment. *Id.* § 659.400(2)(a).

■ In Oregon, stress and depression can be considered mental impairments. *See Wheeler v. Marathon Printing, Inc.,* 157 Or.App. 290, 974 P.2d 207, 212–13 (1998). The same is true under the ADA. In *Holihan v. Lucky Stores, Inc.,* 87 F.3d 362, 365 n. 3 (9th Cir.1996), this court explained that "stress and depression could be covered by the ADA. An EEOC Technical Assistance Manual on the ADA provides that 'stress' and 'depression' are conditions that may or may not be considered impairments, depending on whether these conditions result from a documented physiological or mental disorder." *Id.* (quoting EEOC Technical Assistance Manual on the Employment Provisions (Title I) of the Americans With Disabilities Act § 2.1(a)(i), at II–3 (1992)); *see Mustafa v. Clark County Sch. Dist.,* 157 F.3d 1169,

1174–75 (9th Cir.1998) (per curiam) (finding that plaintiff could be substantially limited in his ability to work because he suffered from depression, post-traumatic stress disorder, and panic attacks).[8]

■ In the case at bench, the evidence relating to Snead's condition is sufficient to raise an issue of fact that she suffered from a documented physiological or mental disorder. First, her own physician wrote that her stress and depression rendered her "medically" disabled. Furthermore, an independent medical examiner, Dr. Charles Bellville, found that Snead suffered from "Post–Traumatic Stress Disorder and Depression."

### b. *Substantially Limiting*

■ Because we conclude that Snead has raised an issue of fact as to whether she has a recognized impairment, we now examine the extent to which it was substantially limiting. The Oregon Court of Appeals has stated that its "opinion in *Quinn v. Southern Pac. Transp. Co.,* 76 Or.App. 617, 711 P.2d 139 (1985)] makes it clear that 'employment,' as used in [Or. Rev.Stat. § ] 659.400(2)(a), does not mean employment in general." *Winnett v. City of Portland,* 118 Or.App. 437, 847 P.2d 902, 907 (1993) ("'A person, for example, who has obtained a graduate degree in chemistry, and is then turned down for a chemist's job because of an impairment, is not likely to be heartened by the news that he can still be a streetcar conductor, an attorney or a forest ranger.'") (quoting *E.E. Black, Ltd. v. Marshall,* 497 F.Supp. 1088,

---

7. A second definition of "substantially limits" is that "[t]he impairment significantly restricts the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform the same major life activity." Or.Rev.Stat. § 659.400(2)(d)(B).

8. At least four other circuits agree that depression can constitute a mental impairment under the ADA. *See Krocka v. City of Chicago,* 203 F.3d 507, 512 (7th Cir.2000) ("Because

[employee's] severe depression is a medical condition diagnosed by a health professional, it qualifies as an impairment under the ADA."); *Criado v. IBM Corp.,* 145 F.3d 437, 442 (1st Cir.1998) ("depression and anxiety compounded by Attention Deficit Disorder substantially limited plaintiff's ability to work"); *Pritchard v. Southern Co. Services,* 92 F.3d 1130, 1132 (11th Cir.1996) ("[d]epression has been held to constitute a mental impairment"); *Doe v. Region 13 Mental Health–Mental Retardation Comm'n,* 704 F.2d 1402, 1408 (5th Cir.1983) (same).

1099 (D.Haw.1980)). The court also rejected, however, the notion that " 'employment' meant ... 'the employment of one's choice with [a particular employer].' " *Id.* (quoting *E.E. Black,* 497 F.Supp. at 1099). Rather, the court chose a sensible compromise and found that an impairment is substantially limiting if it substantially limits the performance of the work involved. *See id.* ("We are ... persuaded that the meaning of the term 'employment' in [Or. Rev.Stat. § ] 659.400(2)(a) is not at either end of the spectrum."). Here, the work involved is that of sales manager.

■ Snead has at least raised a genuine issue of material fact that she was limited in her ability to perform the work involved. Her doctor wrote that she needed leave because she was "medically disabled by stress and depression," not that she was limited only from doing her MDM job at Met. Further, Snead's leave of absence was not temporary, and it even had to be extended. As a result, she did not work at all for nearly two years. *Cf. Hardie v. Legacy Health Sys.,* 167 Or.App. 425, 6 P.3d 531, 540 (2000) (" 'Short term physical or mental impairments leaving no residual disability or impairment are not disabilities.' ") (quoting Or. Admin. R. 839–06–240(1) (1996)).

It is not fatal that Dr. Robert Slack, a Board certified psychiatrist, opined that, given the stalking incident, "[h]er refusal to return to work is understandable," but that she could still function in other work settings. Even if Snead could return to work two years into her recovery, the record still shows that she had been "medically disabled" and had even been suicidal. Therefore, there is a genuine issue of fact about whether Snead's mental condition had prevented her from working as a sales manager, at least while she was on disability leave. *See* Or.Rev.Stat. § 659.400(2)(d)(A).

#### c. *Record of Impairment*

■ Under Oregon law, Snead would have "a record of such impairment" if she "has a history of ... such an impairment."

*Marconi v. Guardian Mgmt. Corp.,* 149 Or.App. 541, 945 P.2d 86, 89 n. 1 (1997) (quoting Or.Rev.Stat. § 659.400(2)(b)). The ADA definition is virtually identical. *See* 29 C.F.R. § 1630.2(k) (2000) (stating that a person has a record of an impairment if that person "has a history of ... a mental or physical impairment that substantially limits one or more major life activities"); *see Burch v. Coca–Cola Co.,* 119 F.3d 305, 321 (5th Cir.1997). The many physicians' notes and various letters in the record, combined with Snead's prolonged leave, create at least a genuine issue of fact regarding a record of Snead's impairment. *See Pritchard,* 92 F.3d at 1134 (paid and unpaid disability leave establish evidence of a record of being impaired).

In conclusion, the evidence shows that Snead has established a genuine issue of material fact that she has a record of disability-and thus is considered disabled under § 659.400. Therefore, under Oregon law, it is not necessary for Snead to also establish either that she is currently impaired or that she is regarded as having that impairment. *See* Or.Rev.Stat. § 659.400(1).

#### 2. *Adverse Employment Action Because of Her Disability*

■ It is beyond challenge that a person's termination is considered an adverse employment action and defendants do not argue otherwise. What is in dispute, however, is whether that adverse action was taken *because* of Snead's disability. In Oregon, "[e]vidence that permits an inference of discrimination" is sufficient for a plaintiff to make a prima facie case that she was discriminated against because of her disability. *See Henderson,* 719 P.2d at 1324.

■ Here, Snead has met her burden of providing evidence which "permits an inference of discrimination." *Id.* Although not strong evidence, conflicting information regarding the timing of the need to eliminate Snead's position creates an infer-

ence that her disability may have been a factor in Met's decision. According to McIntosh, when he spoke to Snead in January 1997, he told her that there was no MDM position available in Portland. Yet, when Moore was asked if it had been his intention up until the point of Snead's call to return her to her old position, he answered that it had been. Further, a March 21, 1997, letter from Met's attorney to Snead's attorney, states that "the decision [to eliminate Snead's position] was made in July 1995, while Ms. Snead was on long term disability leave, to manage the Portland market with only one MDM"- thereby contradicting Moore's testimony. In conclusion, the timing of Snead's termination, coupled with her disability history and her communications with Met, provide sufficient evidence to raise a genuine issue of material fact as to the third element of her prima facie case of discrimination.

 Snead would have us end our analysis at this point. She argues that Met was not entitled to summary judgment because, in order to defeat a defendant's motion for summary judgment, Oregon summary judgment law in employment cases requires only that an employee/plaintiff adduce a prima facie case of discrimination. *See Henderson,* 719 P.2d at 1324; *Callan v. Confederation of Or. Sch. Adm'rs,* 79 Or.App. 73, 717 P.2d 1252, 1254 n. 3 (1986). Met, on the other ·hand, argues that this court should follow the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Which rule we apply depends on the nature of the federal rule.

### B. Beyond the Prima Facie Case: Burden–Shifting

#### 1. *Federal Procedural Law Governs*

 "Federal diversity jurisdiction provides an alternative forum for the adjudication of state-created rights, but it does not carry with it generation of rules of substantive law." *Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 426, 116

S.Ct. 2211, 135 L.Ed.2d 659 (1996). Thus, "[u]nder the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." *Id.* at 427, 116 S.Ct. 2211; *see Hanna v. Plumer,* 380 U.S. 460, 465, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965); *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). As stated by the Supreme court, however, "[c]lassification of a law as 'substantive' or 'procedural' for *Erie* purposes is sometimes a challenging endeavor." *Gasperini,* 518 U.S. at 427, 116 S.Ct. 2211. This is one of those times.

 We are not without guidance, however. In order to assist us in this endeavor, the Supreme Court has "propounded an 'outcome determination' test." *Id.* Under that test, we first ask the following question: " '[D]oes it significantly affect the result of a litigation for a federal court to disregard a law of a state that would be controlling in an action upon the same claim by the same parties in a State court?' " *Id.* (quoting *Guaranty Trust Co. v. York,* 326 U.S. 99, 109, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945)). Additionally, whether such disregard would affect the outcome of an action "must be guided by 'the twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws.' " *Gasperini,* 518 U.S. at 428, 116 S.Ct. 2211 (1996) (quoting *Hanna,* 380 U.S. at 468, 85 S.Ct. 1136). Accordingly, we should not apply this test so as to "produce a decision favoring application of the state rule unless one of these aims will be furthered." *Chamberlain v. Giampapa,* 210 F.3d 154, 159 (3rd Cir.2000).

 Guided by these principles, we address the question whether Oregon's "prima facie only" rule is outcome determinative in this sense: "Would 'application of the [standard] ... have so important an effect upon the fortunes of one or both of the litigants that failure to [apply] it would [unfairly discriminate against citizens of the forum state, or] be likely to cause a plaintiff to choose the federal court'?"

*Gasperini,* 518 U.S. at 428, 116 S.Ct. 2211 (quoting *Hanna,* 380 U.S. at 468 n. 9, 85 S.Ct. 1136) (alterations in the original). If the state law is indeed outcome determinative in light of these aims, we must then decide whether an overriding federal interest justifies application of federal law. *See Byrd v. Blue Ridge Rural Elec. Coop., Inc.,* 356 U.S. 525, 537–39, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958).[9]

### a. The Oregon Rule Is Not Outcome Determinative

 Utilization of the Oregon summary judgment rule-as opposed to the three-part *McDonnell Douglas* analysis-is not outcome determinative. The only significant difference between the state and federal regimes is *when* a case that fails one of the *McDonnell Douglas* components will be dismissed. For example, a plaintiff whose case could not survive summary judgment on the third *McDonnell Douglas* component in federal court for lack of evidence would only delay the inevitable by proceeding in state court where, on the same record, a nonsuit or JNOV would be in order at the close of the plaintiff's case. In either case, the court would ultimately apply the same substantive law, employ the same reasoning, and produce the same result. Only the timing of the case's dismissal (along with the added expense of bringing the case to trial) would differ.

Furthermore, the application of the Oregon scheme in such cases would not further either of *Erie*'s twin aims: discouragement of forum-shopping and avoidance of inequitable administration of the laws.

See *Gasperini,* 518 U.S. at 428, 116 S.Ct. 2211. Although one could speculate, for example, that filing in an Oregon court may be advantageous to employment discrimination plaintiffs because a higher percentage of such claims would go to trial, neither of the "twins aims of *Erie*" is truly implicated. *Hanna,* 380 U.S. at 468, 85 S.Ct. 1136. The identical outcomes produced through the state and federal systems make it improbable that increased forum-shopping will occur. Likewise, because no significant advantage would ultimately be gained by filing in state, as opposed to federal court, it is unlikely that litigants will encounter significantly different results under the two regimes. Therefore, we conclude that, in light of *Erie*'s twin aims, application of the Oregon summary judgment rule in employment discrimination cases would not be outcome determinative if applied by federal courts sitting in diversity.

### b. Overriding Federal Interests

 Additionally, overriding federal interests require application of federal law in this case. *See Byrd,* 356 U.S. at 537, 78 S.Ct. 893. Making a prima facie showing of employment discrimination is not an onerous burden. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Chuang v. University of Cal. Davis, Bd. of Trustees,* 225 F.3d 1115, 1124 (9th Cir.2000) ("The requisite degree of proof necessary to establish a prima facie case for Title VII ... on summary judgment is minimal and does not even need to rise to the level of a

9. No circuit has squarely decided whether a state's application of an alternative to the *McDonnell Douglas* burden-shifting scheme is "procedural" or "substantive" under the *Erie* doctrine. *See Bourbon v. Kmart Corp.,* 223 F.3d 469, 474 (7th Cir.2000) (Posner, J., concurring). This is so because, in most cases, the evidentiary scheme at summary judgment is identical under both state and federal law. *See, e.g., Perry v. Woodward,* 199 F.3d 1126, 1141–42 (10th Cir.1999) (New Mexico); *Norville v. Staten Island Univ. Hosp.,* 196 F.3d 89, 95 (2d Cir.1999) (New York); *Carpenter v. Federal Nat'l Mortgage Ass'n,* 165 F.3d 69, 72 (D.C.Cir.1999) (District of Columbia); *Mullin*

*v. Raytheon Co.,* 164 F.3d 696, 699 (1st Cir. 1999) (Massachusetts); *King v. Herbert J. Thomas Mem'l Hosp.,* 159 F.3d 192, 198 (4th Cir.1998) (West Virginia); *Lee v. Minnesota, Dep't of Commerce,* 157 F.3d 1130, 1133 (8th Cir.1998) (Minnesota); *Nichols v. Lewis Grocer,* 138 F.3d 563, 565–66 (5th Cir.1998) (Louisiana); *Olson v. General Elec. Astrospace,* 101 F.3d 947, 956 (3d Cir.1996) (New Jersey); *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 802 n. 8 (6th Cir.1994) (Kentucky). *But see, Bourbon,* 223 F.3d at 474 (Posner, J., concurring) ("Illinois expressly rejected application of the *McDonnell Douglas* to Illinois retaliatory discharge cases").

preponderance of the evidence.") (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir.1994)). If federal courts sitting in diversity were compelled to follow *Callan* and *Henderson*, nearly every case of employment discrimination filed under Oregon law would go to trial, providing an increased burden on the district courts' already crowded trial dockets. This burden is too high a price to pay for an outcome that would be identical if all three *McDonnell Douglas* components were applied at the summary judgment stage rather than at trial.

Furthermore, "[t]he federal system is an independent system for administering justice to litigants who properly invoke its jurisdiction. An essential characteristic of that system is the manner in which, in civil common-law actions, it distributes trial functions between judge and jury." *Byrd*, 356 U.S. at 537, 78 S.Ct. 893. The policy of uniform enforcement of state-created rights and obligations "cannot in every case exact compliance with a state rule-not bound up with rights and obligations-which disrupts the federal system of allocating functions between judge and jury." *Id.* at 537–38, 78 S.Ct. 893.

### c. *Other Considerations*

Our conclusion that the *McDonnell Douglas* burden-shifting scheme is federal procedural law comports with the Supreme Court's own pronouncements. In *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 521, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), the Court stated that "the *McDonnell Douglas* presumption is a *procedural* device, designed only to establish an order of proof and production." *Id.* (emphasis in the original). Although this statement was not essential to the Court's ultimate decision, it is probative of the Court's view on this subject. The Court has reiterated such view in at least one subsequent case. In *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Court stated that "*McDonnell Douglas* and subsequent decisions have 'established an allocation of the burden of production and an order for the

presentation of proof in … discriminatory-treatment cases.'" *Id.* at 2106 (quoting *St. Mary's*, 509 U.S. at 506, 113 S.Ct. 2742) (ellipsis in the original).

Snead, however, argues that our decision in *Messick v. Horizon Industries Inc.*, 62 F.3d 1227 (9th Cir.1995), mandates the application of the Oregon rule. In *Messick*, we were asked to resolve whether summary judgment should be granted to the defendants on federal and Oregon discrimination claims. *Id.* at 1229. After holding that a grant of summary judgment for the defendants on the plaintiff's federal claim was erroneous because the plaintiff had presented sufficient evidence to raise an issue of fact as to her prima facie case *and* as to pretext, we recognized that Oregon law only required a plaintiff to adduce evidence of a prima facie case in order to defeat summary judgment. *See id.* at 1232. Therefore, without further analysis, we indicated that because the plaintiff "established a prima facie case of discrimination [on the federal claim], summary judgment on the Oregon Age Discrimination Act claim was also inappropriate." *Id.*

This language does not, however, bind us here. In *Messick*, we never analyzed application of the Oregon rule in federal court. Rather, as stated above, we assumed it did, and because we had previously found an issue of fact as to pretext on the federal claim, we did not engage in a separate analysis under state law. *See id.* In short, because, by deciding the summary judgment motion on the federal claim in the plaintiff's favor, we also necessarily decided the state claim in the same way, any discussion regarding application of Oregon's summary judgment law to the plaintiff's state law claim was dicta-the issue had already been decided. Further, "this Court has never considered itself bound [by prior sub silentio holdings] when a subsequent case finally brings the … issue before us." *Burbank–Glendale–Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1363 (9th Cir.1998) (quoting *Will v. Michigan Dep't of State*

*Police,* 491 U.S. 58, 64 n. 4, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (brackets in the original; ellipsis added) (internal quotation marks omitted)). This is such a subsequent case. Until now, the question of whether we should apply the *McDonnell Douglas* burden-shifting scheme to state law claims was an open question. Accordingly, we need not follow *Messick's* assumption.

Our conclusion is also consistent with circuit law on the application of federal summary judgment procedures in diversity cases. *See Gasaway v. Northwestern Mut. Life Ins. Co.,* 26 F.3d 957, 960 (9th Cir.1994) ("In diversity cases, procedural issues related to summary judgment are controlled by federal law."); *Caesar Elec. Inc. v. Andrews,* 905 F.2d 287, 289 n. 3 (9th Cir.1990) ("under the *Erie* doctrine, federal law governs the procedural aspects of summary judgment in a diversity case"); *cf. Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 530–32 (9th Cir.2000) (holding, in a diversity case, that district court did not err in reconsidering state court's denial of summary judgment before removal, which was contended to be law of the case, because "the California summary judgment standard under [Cal.Civ.Proc. Code] § 437c is different in relevant respects from the standard under Fed. R.Civ.P. 56" and necessarily assuming that federal rule applied after removal). We must, therefore, examine the evidence tendered on summary judgment beyond the prima facie case in accordance with *McDonnell Douglas'* burden-shifting model.

### 2. *Pretext Analysis*

■■■ Under the ADA, when an employee establishes a prima facie case of discrimination because of a disability, and the employer provides a non-discriminatory reason for that discharge which "dis-

claims any reliance on the employee's disability in having taken the employment action,"[10] the analysis developed in *McDonnell Douglas* for suits under Title VII of the Civil Rights Act of 1964 applies.[11] *Mustafa,* 157 F.3d at 1175–76 (citing *Teahan v. Metro–North Commuter R.R. Co.,* 951 F.2d 511, 514–16 (2d Cir. 1991)).

■■■ Here, Met has unqualifiedly stated that Snead's condition had nothing to do with Met's elimination of her position. Thus, under *Mustafa,* Snead "bears the burden at trial of showing that [Met's] reason for ... termination was pretextual." *Id.* at 1176; *see also Collings v. Longview Fibre Co.,* 63 F.3d 828, 833 (9th Cir. 1995) ("Unless [plaintiff] can show that [defendant's] explanation for [plaintiff's] discharge was a pretext for disability discrimination, [she has] ... presented no triable issue under the ADA."); *Smith v. Barton,* 914 F.2d 1330, 1340 (9th Cir.1990) (holding that once the employer offers a legitimate, nondiscriminatory reason for the discharge, and that reason disclaims any reliance on the disability, the burden shifts to the employee to demonstrate that the articulated reason is a pretext for disability discrimination).

■■■ Therefore, on summary judgment, we must determine whether Snead provided sufficient evidence to support a finding of pretext. In so doing, the plaintiff retains the burden of persuasion. In other words,

she now ... ha[s] the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by per-

---

10. On the other hand, if the employer acknowledges reliance on the disability in the employment decision, the employer bears the burden of showing that the disability is relevant to the job's requirements. *Mustafa,* 157 F.3d at 1176.

11. It is also undisputed that Met provided a legitimate non-discriminatory reason for Snead's termination-namely, the elimination of her position as part of a reduction in force.

suading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

*Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (citing *McDonnell Douglas,* 411 U.S. at 804–05, 93 S.Ct. 1817).

■ "These two approaches are not exclusive; a combination of the two kinds of evidence may in some cases serve to establish pretext so as to make summary judgment improper." *Chuang,* 225 F.3d at 1127. Furthermore, in making such showing, Snead does not necessarily have to introduce additional, independent evidence of discrimination. *See Reeves,* 120 S.Ct. at 2109; *Chuang,* 225 F.3d at 1127. "As the Supreme Court recently reaffirmed, a disparate treatment plaintiff can survive summary judgment without producing any evidence of discrimination beyond that constituting h[er] prima facie case, if that evidence raises a genuine issue of material fact regarding the truth of the employer's proffered reasons." *Id.* (citing *Reeves,* 120 S.Ct. at 2108).

■ Although Snead has provided sufficient evidence to support an inference of discrimination, and thus has met her burden on her prima facie case, that evidence is not sufficient to raise a genuine issue of material fact regarding the truth of Met's proffered nondiscriminatory reasons or that a discriminatory reason more likely motivated Met to eliminate her position. *See Burdine,* 450 U.S. at 256, 101 S.Ct. 1089. On the contrary, the evidence presented by Snead reinforces Met's proffered justification. For example, Snead's evidence shows that less than two months after Snead's position was eliminated, the other Portland MDM position was also eliminated. This evidence confirms that Met's business decision to reduce its work force in Oregon was independent of Snead's disability. This evidence also shows that at least one other similarly situated employee (Todd) was treated in a

similar manner as Snead, thereby negating any showing of pretext. In light of this evidence, although it is true, as we have noted above, that there are some inconsistencies in Met's statements as to the timing of its decision to eliminate Snead's MDM position, those inconsistencies are not so great as to show that Met's reason was pretextual. Consequently, Snead has failed to raise a genuine issue of material fact that Met's legitimate, nondiscriminatory reason for her termination was pretextual.

### C. Action Against Employee

Snead also brought a claim against McIntosh for violation of § 659.030(1)(g) which makes it unlawful for "any person, whether an employer or an employee to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under ... [Or.Rev.Stat. §§ ] 659.400 to 659.5454 or to attempt to do so." Because Snead failed to raise a genuine issue of material fact that Met's legitimate, nondiscriminatory reason for her termination was pretextual, her "aiding and abetting" claim against McIntosh also fails.

### IV. CONCLUSION

■ We hold that when entertaining motions for summary judgment in employment discrimination cases arising under state law, federal courts sitting in diversity must apply the *McDonnell Douglas* burden-shifting scheme as a federal procedural rule. Applying that scheme here, we conclude that, although she has made out a prima facie case, Snead has failed to raise a genuine issue of material fact that Met's reason for her termination was pretextual. Accordingly, we affirm the district court's grant of summary judgment in favor of defendants.

**AFFIRMED.**

LAY, Circuit Judge, Dissenting:

I respectfully dissent. The issue before us is one interpreting the Oregon disability statute. The Oregon law is to "be construed to the extent possible in a manner

that is consistent with any similar provisions of the federal Americans with Disabilities Act." [1] Or.Rev.Stat. § 659.449. However, the Oregon appellate courts specifically reject the federal burden-shifting scheme applied by the majority in this case.[2] *See Henderson v. Jantzen, Inc.*, 79 Or.App. 654, 719 P.2d 1322, 1323–24 (1986). ("A plaintiff's prima facie case [for employment discrimination] does not disappear merely because a defendant asserts a non-discriminatory reason which may or may not persuade the trier of fact."). Because the two statutes are different, this case does not present an issue of whether the state or federal burden of proof should be applied. It seems axiomatic that in applying the Oregon statute we need to apply Oregon law which interprets that statute. In other words, it is incongruous for a federal court to dismiss a prima facie case made under the Oregon disability statute based on a burden of proof paradigm designed for disparate treatment cases brought under a totally different statutory scheme. *See Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1283–84 (7th Cir.1996). *Erie* and *Byrd* both teach us that we simply exchange courtrooms, not law, in deciding diversity cases.

*See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Byrd v. Blue Ridge Rural Elec. Coop., Inc.*, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958). In this case, I am not aware of any federal policy such as those discussed in the majority opinion which should override application of the Oregon law in a diversity case.

Furthermore, applying *McDonnell Douglas* principles to the facts of this case seems to be a complete non sequitur. This is not a disparate treatment case of the sort which the *McDonnell Douglas* burden of proof is designed to govern. Snead does not contend that other employees who were similarly situated were treated more favorably than her. Snead simply claims that she has a disability but is still qualified to work with or without accommodation.

Thus, even if the Oregon law parallels the ADA, the facts of this case do not fit within the *McDonnell Douglas* framework. Rather, the language of the ADA sets the threshold Snead must meet in order to defeat summary judgment. Snead must establish that (1) she is disabled; (2) she is qualified to perform the essential functions

1. Notably, the statutory language of the Oregon law is phrased much differently than that of the ADA. The Oregon law states that "[i]t is an unlawful employment practice for any employer to ... discharge from employment ... an otherwise qualified person [because such person] is a disabled person." Or.Rev.Stat. § 659.436(1) (1999). The ADA states that an employer "shall [not] discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... discharge of employees." 42 U.S.C. § 12112(a).

2. The *McDonnell Douglas* burden-shifting analysis applied by the majority was fashioned by the Supreme Court to analyze claims brought under Title VII of the Civil Rights Act of 1964. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–06, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The Court has explained that "[t]he *McDonnell Douglas* division of intermediate evidentiary burdens serves to bring the litigants and the court ... to [the] ultimate question [of whether the defendant intentionally discriminated against

the plaintiff]" in violation of Title VII. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Accordingly, once a plaintiff makes a prima facie case, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for its allegedly discriminatory actions. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. If the employer does so, the prima facie case disappears and the employee must then show that the employer's proffered reasons were pretext for discrimination. *See id.* at 804, 93 S.Ct. 1817.

In contrast, the ADA was designed "to provide clear, strong, consistent, enforceable standards" to eliminate discrimination against disabled individuals. 42 U.S.C. § 12101(b)(2). As such, unless disparate treatment with others similarly situated is alleged, there is no statutory avenue under the ADA for an employer to articulate a nondiscriminatory reason for its actions or for an employee to show that the employer's reason was pretextual.

of the job, either with or without accommodation; and (3) she was terminated by reason of her disability. *See Barnett v. U.S. Air, Inc.,* 228 F.3d 1105, 1121 (9th Cir.2000) (en banc). If the employee cannot show a genuine issue of material fact on any of the three prongs, summary judgment is appropriate.

As for the first prong, I agree with that part of the majority's opinion that finds there is a genuine issue of disputed fact as to whether Snead is disabled.

The second prong of Snead's prima facie case requires a two-part showing. First, Snead must demonstrate that she meets the necessary prerequisites for the job. *See* 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m); *cf.* Or.Rev.Stat. § 659.436(2)(e). Met concedes that Snead is qualified to perform the essential functions of the MDM position that she held prior to her leave of absence. Next, Snead must show that she can perform the essential functions of the job with or without reasonable accommodation. *See* 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m); *cf.* Or.Rev.Stat. § 659.436(2)(e). Unlike many ADA claimants, Snead did not ask Met to alter her job in a way that would accommodate her disability. Snead was prepared to return to her MDM position without any modifications to the job as it was before she went on leave. In other words, she simply asked Met for her old job back. At this point she has shown that she is qualified to perform the essential functions of the MDM position with or without accommodation.

However, by the time Snead was prepared to return to work, Met had for business reasons eliminated her former MDM position and thus, could not restore her to that job. The court will not interfere with Met's business judgment to institute a reduction-in-force unless that action runs afoul of the law. *See National Labor Relations Bd. v. Harrah's Club,* 337 F.2d 177, 180 (9th Cir.1964). Yet this fact in itself is not fatal to Snead's ability to establish a causal link between her disability and Met's actions. Snead does not claim a right to the particular MDM position she formerly held, nor could she under either federal or Oregon law. *See Thompson v. Holy Family Hosp.,* 121 F.3d 537, 540 (9th Cir.1997); *Winnett v. City of Portland,* 118 Or.App. 437, 847 P.2d 902, 907 (1993). But assuming Snead can prove that she was disabled, before Met can terminate her it must try to provide other reasonable accommodation or employment opportunities. Met did just that by presenting Snead with three options. First, it offered her continued employment out of the Seattle office, albeit at a lesser position than the one she previously held. Second, Met offered a similar MDM position at a different geographic location. Finally, because her former position had been eliminated from the company, Met offered Snead a severance package. In the end, Met terminated Snead when her request for further information about these alternatives arrived too late. That excuse belies Met's sincerity in offering Snead continued employment with the company.[3]

Assuming that the Oregon disability statute, like the ADA, recognizes the need for parties to engage in a good-faith interactive process to arrive at a reasonable accommodation, then it seems to me there is a gap in the majority's analysis that still leaves this matter unresolved.[4] As this

---

**3.** "A few hours' tardiness should not be the reason for cutting off the interactive process and cutting off a person's rights under the ADA." *Bultemeyer,* 100 F.3d at 1286.

**4.** An employer commits unlawful discrimination under the ADA if the employer does "not mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless

[the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." 42 U.S.C. § 12112(b)(5)(A); *cf.* Or.Rev.Stat. § 659.436(2)(e). The ADA's regulations state that: "To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the [employee] with a disability in need of the accommodation. This process should identify the

court has held, "[t]he interactive process is triggered either by a request for accommodation by a disabled employee or by the employer's recognition of the need for such an accommodation." *Barnett,* 228 F.3d at 1112. The interactive process is mandatory at this point and requires "good-faith exploration of possible accommodations between employers and individual employees." *See id.* at 1114. It is then the employer's burden to show that a proposed accommodation will cause undue hardship. *See id.* at 1113. Thus, in light of Snead's proof and Met's offer of accommodation, there is still missing a good-faith interactive process which should be available to both parties to attempt to resolve any differences. Under the foregoing analysis, the issue of pretext, which is addressed by the *McDonnell Douglas* framework, is subsumed by the issue of reasonable accommodation. Once a party shows she suffers from a disability but is qualified to carry on work with or without accommodation, the issue becomes whether the employer has entered into a good-faith interactive process to find a reasonable accommodation. The question is whether the accommodation is reasonable and will not cause the employer undue hardship. Pretext should never be an issue in an ADA analysis. Pretext relates to an employer's subjective motivation. Reasonable accommodation relates to an objective analysis of whether other jobs are available which the employee is qualified to do.

Nevertheless, the elimination of Snead's job, for whatever reason, does not preclude further inquiry under the ADA. To survive summary judgment Snead must demonstrate a genuine issue of material fact as to whether the parties engaged in a good-faith interactive process aimed at reasonable accommodation. If no other jobs exist, then the inquiry ends because it is impossible under the circumstances for an employer to accommodate the employee. An employer is not required to undertake

precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29

undue hardship in accommodating a disabled employee. *See* 42 U.S.C. § 12111(10); *cf. Kellogg v. Union Pacific R.R. Co.,* 233 F.3d 1083, 1089 (8th Cir. 2000) (recognizing that under the ADA "an employer is not required to make accommodations that would subvert other, more qualified applicants for the job."); Or.Rev. Stat. § 659.436(2)(e). But that is not the situation here. Met has sought to reasonably accommodate Snead by offering her various alternatives. By its own actions Met has shown that these offers for accommodations do not pose an undue hardship on its business.

Accordingly, I fail to see how the *McDonnell Douglas* framework for disparate treatment cases relates in any way to the facts of the present case. Here, notwithstanding the elimination of Snead's previous position, Met, at least initially, made an effort to accommodate her. There is no issue of pretext lurking in that. The sole issue that remains is whether Met and Snead have engaged in a good-faith interactive process to determine whether reasonable accommodation is feasible. Without the clarification requested by the plaintiff, it seems to me that there exists an evidentiary gap that needs to be filled before this case can be decided.

I would therefore reverse the grant of summary judgment and remand the case to the district court for further proceedings.

C.F.R. § 1630.2(*o*)(3). *See also Taylor v. Phoenixville Sch. Dist.,* 174 F.3d 142, 156–165 (3d Cir.1999).