Matthew J. ROLOFF, Plaintiff,

v.

SAP AMERICA, INC., a Delaware Business Corporation, Defendant.

Civil No. 04–756–HU.

United States District Court, D. Oregon.

May 26, 2006.

Craig A. Crispin, Crispin Employment Lawyers, Portland, OR, for Plaintiff.

James C. Webber, Littler Mendelson, P.S., Seattle, WA, for Defendant.

### ORDER

HAGGERTY, Chief Judge.

In his Findings and Recommendation [56] dated March 20, 2006, Magistrate Judge Hubel recommended granting defendant's Motion for Summary Judgment [22]. Plaintiff filed objections to the Findings and Recommendation. The Findings and Recommendation was referred to this court on April 26, 2006.

When a party objects to any portion of a Magistrate Judge's Findings and Recommendation, the district court must make a *de novo* determination of that portion of the Magistrate's report. 28 U.S.C. § 636(b)(1)(B); *McDonnell Douglas Corp. v. Commodore Business Mach., Inc.*, 656 F.2d 1309, 1313 (9th Cir.1981).

Plaintiff's objections were filed in a timely manner. The court has given the file of this case a *de novo* review, and has also carefully evaluated the Magistrate's Findings and Recommendations, the objec-tions, and the entire record. Magistrate Judge Hubel provided a thorough analysis of the facts and circumstances regarding this litigation, and that analysis need not be repeated here. Magistrate Judge Hubel's recommendations are sound, correct, and entitled to adoption.

### ANALYSIS

Plaintiff argues that the Findings and Recommendation erred in concluding that the employer did not fail to provide reasonable accommodation. Plaintiff contends that the Findings and Recommendation allows defendant to "rely on the results of its own failure to provide reasonable accommodations to demonstrate that they were not required." Pl.'s Objections at 5.

This court has considered the objections. The court concludes that the Findings and Recommendation determined correctly that plaintiff conceded his reasonable accommodation claim. Findings and Recommendation at 14–15.

Defendant is required by law to provide reasonable accommodation to allow plaintiff to perform the essential functions of his job. 29 C.F.R. § 1630.2(*o*)(1)(ii). Plaintiff accepted defendant's statement of fact that plaintiff "was fully able to perform his job without accommodation." Findings and Recommendation at 1119. Accordingly, the Findings and Recommendation concluded properly that in light of "plaintiff's concession that he was able to perform those functions without reasonable accommodation, his reasonable accommodation claim must fail." *Id.* at 1120.

In addition to providing reasonable accommodation to ensure employees can perform the essential functions of their job, employers are also required to provide reasonable accommodation to ensure employees have access to the "equal benefits and privileges of employment." 29 C.F.R. § 1630.2(*o*)(1)(iii). Plaintiff's argument

that defendant failed to provide equal benefits and privileges of employment also fails. As the Findings and Recommendation noted, those benefits and privileges have been defined as access to lunchrooms, employee lounges, rest rooms, meeting rooms, and other employer-sponsored services such as health programs, transportation, and social events. Findings and Recommendation at 1121. Plaintiff did not request such accommodations.

Plaintiff also argues that the Findings and Recommendation erred by requiring "specific and substantial" circumstantial evidence of pretext in its analysis of the discrimination claim. Pl.'s Objections at 6. There is some authority in the Ninth Circuit that the "specific and substantial" burden for circumstantial evidence is in tension with the Supreme Court decision in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). *See Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1030–31 (9th Cir.2006) (recognizing tension between Ninth Circuit decisions requiring specific and substantial circumstantial evidence and the Supreme Court decision in *Costa*, but acknowledging that only an *en banc* panel can overturn Ninth Circuit precedent).

However, it is undisputed that plaintiff must produce "some evidence" suggesting that the defendant's decision to terminate him was motivated in part or in whole by discriminatory intent, regardless of whether he must provide "specific and substantial evidence." *Id.* at 1030. The Findings and Recommendation concludes that defendant provided evidence of a legitimate, nondiscriminatory basis for its termination of plaintiff and that plaintiff did not meet his burden of providing evidence of pretext. Findings and Recommendation at 1123 – 1124. The Findings and Recommendation notes that plaintiff "grossly overstates the evidence or draws unsupportable inferences from the record." *Id.* at 1124.

Plaintiff argues that defendant's evidence regarding the layoff decisionmaking process is not credible and that the lack of credibility satisfies plaintiff's burden of demonstrating pretext. The Findings and Recommendation provides a thorough analysis of the plaintiff's argument and the supporting evidence offered by plaintiff. *Id.* at 1124 – 1129. After scrutinizing the record and plaintiff's objections, this court concludes that the Findings and Recommendation's analysis is sound. Viewing the evidence in the light most favorable to plaintiff and even employing the lesser burden of proof established in *Costa* and *Cornwell*, this court concludes that plaintiff failed to provide sufficient evidence demonstrating pretext.

## CONCLUSION

For these reasons, Magistrate Judge Hubel's Findings and Recommendation [56] is ADOPTED in its entirety. Defendant's Motion for Summary Judgment [22] is GRANTED.

IT IS SO ORDERED.

## FINDINGS & RECOMMENDATION

HUBEL, United States Magistrate Judge:

Plaintiff Matthew Roloff brings this disability discrimination case against his former employer SAP America, Inc. Defendant moves for summary judgment. I recommend that the motion be granted.

## BACKGROUND

Defendant provides business software and support which assist corporate clients with payroll, finance, and other record keeping functions. In July 2001, defendant reorganized its sales force and formed the "CRM Sales Team," with CRM

standing for "Customer Relationship Management." As part of this reorganization, defendant engaged in aggressive hiring of CRM Solutions Engineers, Defendant hired plaintiff on November 14, 2001, as a Solutions Engineer III. It is undisputed that plaintiff, who has "dyrostrophic dwarfism," is disabled.

Plaintiff initially reported to Tim Leschinski, who was later dismissed for performance-related reasons in February 2002. Defendant asserts that following Leschinski's dismissal, plaintiff began reporting to William Beck, Director of CRM Solutions. Beck Affid. at ¶ 2. Plaintiff contends that after being supervised by Leschinski, he was next supervised by Mark Nix until March 2004 [1] and was assigned to report to Beck for only about the last month, or slightly more, of his employment. Pltf Declr. at ¶ 13. Leschinski and Beck both reported to Mary Sibley, Director of Solution Support. Plaintiff does not indicate who Nix reported to.

In late March or early April 2002, Sibley asked plaintiff to represent defendant at a trade show in May. Plaintiff sent Beck an email, dated April 9, 2002, expressing concern about whether being "signed up for MSE" was appropriate and about the height of the "pods," or display booths. Exh. B to Pltf Declr. He noted that there have been times in the past where he has had difficulty accessing the keyboards and though he had done trade shows in the past, he has sometimes wondered if his lack of mobility impedes his effectiveness. *Id.* He asked Beck for his thoughts. *Id.*

Beck responded to plaintiff in an April 21, 2002 email, first apologizing for the late reply, and then stating that assignment for pods is based on general knowledge and availability and that plaintiff should be fine because it is a "scripted demo." *Id.* Beck

also stated that he had no idea how high the pods were because he never worked ASUG before. *Id.* He asked plaintiff if plaintiff had any suggestions. *Id.*

Although the email correspondence in the record does not reveal the initial communication between Beck and Dan McDevitt, defendant's Director of Events, Beck states that after receiving plaintiff's email, he contacted McDevitt regarding the booths and pods to be used at the trade show. Beck Affid. at ¶ 6. According to Beck, McDevitt told Beck that once McDevitt knew which pod would be used at the specific trade show, he would determine how to make appropriate modifications if any were needed. *Id.*

Someone must have contacted defendant's "Human Resources Business Partner" Jewell Parkinson because on Monday, April 22, 2002, the day after Beck replied to plaintiff's email regarding the trade show, she sent an email to Beck asking if he was familiar with anyone who has worked ASUG before who could provide information to plaintiff regarding the pods. Exh. B to Pltf Declr. She asked if Beck knew if marketing was responsible for the pods. *Id.* She then stated:

> My concern is that if Matt is to work the pod and he may need a special accommodation to do this, we need time in advance to make the arrangements/evaluate the cost to do this. Matt may not feel this is the best use of his time, but this is not his call. If the mobility issue is a factor, we need to try to eradicate it as best we can, so he can still function at ASUG.

*Id.* This is the only communication from Parkinson on this issue reflected in the record.

1. Although the Declaration states March 2004, I assume this is a typographical error given that plaintiff was laid off in 2002. I assume the date was meant to be March 2002.

The next day, April 23, 2002, Beck emailed plaintiff that he confirmed that the pods for ASUG were the same defendant used for other large tradeshows. *Id.* He described them as having a stool that sits on a raised pedestal with a viewing screen behind your head. *Id.* He asked plaintiff if that presented a problem and to please advise. *Id.*

In response, plaintiff sent Beck the following email:

Bill,

I'll give you the bottom line.

It's not easy for me at Tradeshows—It's difficult to talk with people when they are standing and "milling" around. When the terminals are high it's even more challenging.

I used to do them often and can make it work. I'll be happy to do ASUG if you think it's best. If you don't care—I'd prefer to pass. Either way I'm a happy camper.

*Id.*

Later that day, Beck emailed plaintiff to confirm a telephone conversation he had just had with plaintiff in which he requested plaintiff review upcoming marketing events by defendant to find a tradeshow somewhere on the west coast which would likely be using the pods to be used at the show in Anaheim, and where plaintiff could look at the pods and see what he thought. *Id.* Beck added that "[p]erhaps some minor changes to the pod configuration can make it an easier experience for you." *Id.* He also told plaintiff that McDevitt was expecting plaintiff's call.

That evening, plaintiff emailed McDevitt regarding the pod booths for the ASUG show. Exh. C to Pltf Declr. He indicated that his contact was to inquire about pod booth access. *Id.* He told McDevitt that he had a physical impairment "that may provide some challenges to access the pods at the ASUG show." *Id.* He noted that Beck recommended he look at one to de-

termine if he could effectively access the pods, or maybe "we can 'rig' something up." *Id.* Plaintiff stated that his hunch was that he could "crawl up on the stool using a small stool or something." *Id.* Plaintiff copied Beck with that email.

McDevitt responded the next day, April 24, 2002, and noted that if plaintiff knew what type of pod would be used, it would help determine the appropriate modification. *Id.* He told plaintiff he could help determine the type of pod if he knew its title or number at ASUG. *Id.* McDevitt also copied Beck with the email.

A couple of days later, McDevitt emailed Beck, with a copy to plaintiff, that he had not yet heard back from plaintiff as to which type of pod he was using at ASUG. *Id.* He noted that if Beck could identify a pod name or number, "we could consider the best course of action." *Id.*

Beck responded by emailing McDevitt, with a copy to plaintiff, instructing plaintiff to email two other people to see if they had assigned pods yet. *Id.* Plaintiff responded back to Beck as follows:

Bill, Let's not worry about this anymore. I've left a voice message for Dan—If Dan (or I will) bring a small step stool. I'm sure I can get up on the bar stools. It's more embarrassing to be making a big deal out of it and contacting half the world to try and figure this out.

I never met a stool I couldn't somehow crawl up on. It may look funny—But I can always get up.

*Id.*

In response, Beck wrote:

Hi Matt,

Good enough for me. My intention here is to let you know that we are committed to removing any obstacles that would prevent your participation in these shows. I don't want you to feel uncomfortable about it, just that we are com-

mitted to affording you reasonable accommodations when requested and where required.

Bill

*Id.*

Plaintiff did not make any more requests in regard to this trade show. He successfully worked the trade show and did not report any difficulties.

Following these communications about the trade show, plaintiff emailed Parkinson with what he called a "wish list." Parkinson Affid. at ¶ 4. Plaintiff indicated in the subject line of the email that the topic was "Special needs." Exh. A to Parkinson Affid. He told Parkinson of his disability and stated that he had "a few specific requirements but would like to be able to keep these request[s] confidential as to not influence my management in any way." *Id.* He then told Parkinson to "[t]hink of this as a wish list" and stated that "in no way am I demanding any of these items." *Id.* He proceeded to request a motorized scooter for business travel, a docking station (or extra power cord) for his lap top, and the ability to use taxis instead of rental cars when traveling. *Id.* Finally, in a postscript, he requested a satellite modem for his home office, although he acknowledged that Leschinski had previously denied that request. *Id.* As plaintiff requested, Parkinson never told his managers, including Beck and Sibley, about his requests.

By early June 2002, defendant's upper management had determined that its aggressive sales expansion effort was not a success. Defendant decided to reduce expenses by disbanding the CRM unit, terminating some Solutions Engineers, and integrating a portion of the remaining team into the rest of the organization.

There were approximately 125 employees in the affected group, including plaintiff and fifty other Solutions Engineers. All of these Solutions Engineers reported directly or indirectly to Sibley. Sibley, however, was not involved in the decision to disband the CRM unit.

Sibley was instructed that a certain number of Solutions Engineers would have to be terminated. Sibley was in charge of the process that identified which Solutions Engineers would be released from employment. Plaintiff and nine other Solutions Engineers were selected for termination during this process.

According to defendant, five directors, including Sibley and Beck, participated in the process of selecting which CRM Solutions Engineers would be terminated. Beck states that they prepared a "stacked ranking" of all of the CRM Solutions Engineers based upon the employees' performance as evaluated under specific performance criteria. Beck Affid. at ¶ 14. Beck states that the following criteria were used: 1) operational CRM skills; 2) analytical CRM skills; 3) knowledge of R/3 [2]; 4) team skills; 5) 2002 revenue, year to date; 6) 2001 revenue; and 7) the last three months' productivity. *Id.*

Beck further asserts that each director rated his or her team members based upon the director's experience working with the employee and also based upon input from account executives. *Id.* at ¶ 15. He states that the directors took into account the Solutions Engineers' depth of knowledge, their ability to provide demonstrations that showcased defendant's services, and the ability to do different levels of such demonstrations. *Id.*

---

**2.** According to Beck, "R/3" is defendant's main software product. Generally speaking, it is the business software designed to run a business's payroll, finance, human resources, logistics, and manufacturing operations on an integrated format (i.e., ERP—enterprise resource planning software). Beck Affid. at ¶ 14.

Beck also states that of the fifty-one Solutions Engineers, plaintiff was ranked in last place. Beck Affid. at ¶ 16; *see also* Parkinson Affid. at ¶ 7. Beck asserts that the ten lowest-ranked Solutions Engineers, including plaintiff, were laid off in July 2002. *Id.* Parkinson states that four CRM Account Executives were laid off at the same time. Parkinson Affid. at ¶ 7. In the months following the first wave in the reduction in force, additional reductions were made for a total of approximately sixty-five CRM employees being laid off. *Id.*

Plaintiff disputes Beck's and Parkinson's assertions regarding the reduction in force. Plaintiff contends that defendant is unable to explain the process of development of the termination evaluation criteria. Plaintiff suggests that the document listing termination evaluation criteria "was created after the fact." Pltf CSF at ¶ 11. Plaintiff notes that the "[t]he spreadsheet listing plaintiff last among Solutions Engineers, ..., was created after the meeting in which defendant selected Solutions Engineers for termination, was created by an unknown person, and was subject to manipulation." Pltf CSF at ¶ 12. Furthermore, plaintiff states, defendant's witnesses disagree as to whether the selection process occurred by conference call or in-person meeting and who attended.

Plaintiff states that the evidence shows that defendant is unable to explain communications about the ranking of the engineers or its manipulation of such ranking after the meeting. Despite Beck's description of the termination evaluation criteria, plaintiff contends that neither his qualifications, his work performance, his operational CRM skills, his analytical CRM skills, his knowledge of R/3, his team skills, his 2002 revenue year to date, his 2001 revenue, nor his last three months' productivity, were considered in the meeting in which defendant selected Solutions Engi-

neers for termination. Moreover, plaintiff states, defendant cannot identify the sources of any oral input it might have received, nor produce any written documents supporting its claimed numerical values assigned to plaintiff. And, plaintiff states, his performance review was not considered, and no performance review was created in connection with defendant's decision to terminate him.

Finally, he asserts that his performance in the areas purportedly considered by defendant, compared favorably to those not selected for termination.

In contrast to the disputes plaintiff raises about the layoff process, plaintiff does not dispute defendant's assertion that he was fully able to perform his job without accommodation. He rates himself as a top performer and testified that he received multiple compliments about the quality of his work. Plaintiff agrees that he was never disciplined or reprimanded while employed by defendant and that absent the reorganization and reduction in force, he would not have been terminated in July 2002.

## STANDARDS

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of " 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

"If the moving party meets its initial burden of showing 'the absence of a mate-

rial and triable issue of fact,' 'the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense.'" *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir.1991) (quoting *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987)). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548.

The substantive law governing a claim determines whether a fact is material. *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). All reasonable doubts as to the existence of a genuine issue of fact must be resolved against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court should view inferences drawn from the facts in the light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 630–31.

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. *Id.; In re Agricultural Research and Tech. Group*, 916 F.2d 528, 534 (9th Cir.1990); *California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir.1987).

## DISCUSSION

Plaintiff brings claims under both the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101–12213, and under Oregon law, Oregon Revised Statutes (O.R.S.) 659A.100–659A.145. He contends that defendant failed to reasonably accommodate his disability and terminated him because of his disability.

Defendant moves for summary judgment on all claims.

## I. Reasonable Accommodation

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability. . . ." 42 U.S.C. § 12112(a). The term "discriminate" includes

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]

42 U.S.C. § 12112(b)(5)(A).

To determine what the appropriate reasonable accommodation should be, the "legislative history makes clear that employers are required to engage in an interactive process with employees in order to identify and implement appropriate reasonable accommodations." *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1111 (9th Cir. 2000), *vacated on other grounds*, 535 U.S. 391, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002). The regulations envision "an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(*o*)(3).

■ Generally, the interactive process "is triggered either by a request for accommodation by a disabled employee or by the employer's recognition of the need for such an accommodation." *Barnett*, 228 F.3d at 1112. The employer should initiate the reasonable accommodation process without being asked if the employer: "(1) knows that the employee has a disability,

(2) knows, or has reason to know, that the employee is experiencing workplace problems because of the disability, and (3) knows, or has reason to know, that the disability prevents the employee from requesting a reasonable accommodation." *Id.* (internal quotation omitted).

■ Plaintiff raises two arguments in support of his reasonable accommodation claim. First, he contends that defendant breached its duty to reasonably accommodate his disability by the way it handled his requests regarding the trade show. Plaintiff argues that he sought to engage in a dialogue about his disability in connection with the trade show assignment and defendant's response was to make plaintiff's limitations public by involving many others within the company about plaintiff's disabilities which in turn embarrassed plaintiff, causing him to downplay the matter.

I reject this matter, both legally and factually. The evidence in the record shows that plaintiff himself contacted Beck initially about the trade show pods. The only person Beck appears to have affirmatively contacted was McDevitt. At some point in the exchange about the pods, Beck told plaintiff to contact two other people to ask if particular pods had been assigned to that particular trade show so that McDevitt could work with plaintiff regarding specific pod modifications. The record does not show that plaintiff contacted those people. Thus, the record does not support plaintiff's position that defendant made plaintiff's limitations public by involving "many others" within the company.

Even if defendant had done so, however, defendant's actions were not a failure to reasonably accommodate plaintiff. Plaintiff himself halted the dialogue, terminating defendant's obligation to continue it. Additionally, plaintiff cites no law in support of his position that an employer's need to consult other employees in deter-

mining what reasonable accommodations can be made or are needed, violates the duty to engage in an interactive process. Thus, even if the facts support plaintiff's argument, there is no law showing that defendant's actions were in violation of the ADA and somehow justified plaintiff's abandoning his reasonable accommodation efforts.

■ The next reasonable accommodation argument plaintiff makes is that defendant's failure to provide the reasonable accommodations denoted in plaintiff's "wish list" emailed to Parkinson, caused him to perform at a less than superior level, resulting in his low ranking in the termination evaluation process. I reject this argument.

I agree with plaintiff that his accommodation request does not need to be phrased in terms of "demand for accommodation." The law is clear that a plaintiff does not need to use any magic words to initiate the interactive accommodation process with his or her employer. *Barnett*, 228 F.3d at 1122 ("An employee requesting a reasonable accommodation should inform the employer of the need for an adjustment due to a medical condition using 'plain English' and need not mention the ADA or use the phrase 'reasonable accommodation.' ") (internal quotation omitted).

However, assuming that the "wish list" was a valid request for reasonable accommodation, the law does not support plaintiff's argument that defendant must provide reasonable accommodations to improve plaintiff's performance. In his Response to Defendant's Concise Statement of Fact, plaintiff accepts defendant's statement that "[p]laintiff's testimony is that he was fully able to perform his job without accommodation[.]" Pltf CSF #1 (stating that plaintiff accepts defendant's paragraphs 1, 2, 11,

12, 13, 17, and 18) (original assertion in Defendant's CSF # 17).

The law requires defendant to provide reasonable accommodation to plaintiff to allow him to perform the essential functions of his job. *E.g.*, 29 C.F.R. § 1630.2(*o*)(1)(ii) (defining reasonable accommodation to include "modifications or adjustments ... that enable a qualified individual with a disability to perform the essential functions of that position"). With plaintiff's concession that he was able to perform those functions without reasonable accommodation, his reasonable accommodation claim must fail.

In his initial briefing, plaintiff cited no law in support of his argument. During oral argument, plaintiff conceded he had no case law to support his position, but he argued that an employer should not be allowed to rely on certain job performance criteria as the basis for a layoff while simultaneously denying that those criteria are essential functions of a job. I disagree. Generally, a layoff presumes that the employees are all performing adequately, but the employer must nonetheless use some criteria to determine which employees will be laid off. Sometimes the determinative criterion is seniority. In other instances, the criteria include more subjective performance rankings. But, given that all those considered for layoff are currently employed, it is reasonable to presume that in the first instance, all are adequately performing the essential functions of their positions.

Plaintiff's argument would prevent an employer from ever including a disabled employee in a layoff. For example, assume that all of the Solutions Engineers could perform the essential functions of the position at an above average level, but that in consideration of various performance criteria used to determine who should be laid off, plaintiff was ranked lower than those with superior performances. Pre-

sumably, plaintiff would be targeted for the layoff. But, if plaintiff's argument prevails, the employer could not layoff plaintiff without risking liability and instead, would have to offer plaintiff accommodations to enhance his performance to make it on par with those performing better. I find no support in the law for such a position.

Following oral argument, plaintiff moved to file a supplemental memorandum on this issue. I allowed plaintiff to do so and allowed defendant to respond. In support of his argument, plaintiff initially cites to 29 U.S.C. § 1630.2(*o*)(1)(iii) which defines reasonable accommodation to include "[m]odifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities." Plaintiff notes that nothing in the regulation refers to "essential job functions." He argues that the concept of "essential job functions" is relevant under the ADA only to the determination of whether someone is "qualified," but is not relevant to the definition of reasonable accommodation.

I disagree. The complete regulation reads as follows:

(*o*) Reasonable accommodation.

(1) The term reasonable accommodation means:

(i) Modifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires; or

(ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position; or

(iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

29 C.F.R. § 1630.2(*o*). Clearly, the structure of the regulation shows that subsection (i) addresses accommodations to the preemployment application process. Subsection (ii) addresses accommodations required for the performance of the essential functions of the job, squarely contradicting plaintiff's position that "essential functions" plays no part in defining reasonable accommodation. Subsection (iii) is, on its face, a bit more ambiguous in its "benefits and privileges" language. The question then becomes what is covered by subsection (iii).

Plaintiff relies on the EEOC's Technical Assistance Manual (TAM) for the proposition that accommodations may be required for job-related functions other than the essential functions. *See* Pltf Supp'l Mem. at pp. 3–6 (citing EEOC TAM at §§ 3.1, 3.3, 3.4, 3.10, 7.1, 7.2, 7.3, 7.5, 7.6, 7.7, 7.12). A fair reading of the cited provisions shows, however, that the EEOC considers an employer's duty to be to ensure equal opportunity in the application process, to enable a qualified individual with a disability to perform the essential functions of a job, and to enable an employee with a disability to enjoy equal benefits and privileges of employment. *Id.* at p. 3 (quoting TAM § 3.3).

As an example of equal benefits and privileges, the TAM lists equal access to lunchrooms, employee lounges, rest rooms, meeting rooms, and other employer-provided or sponsored services such as health programs, transportation, and social events. *Id.* In another section the TAM notes that making a drinking fountain accessible by installing a paper cup dispenser may be a required reasonable accommodation which would allow a disabled employee equal access to a "benefit" or "privilege." *Id.* at p. 4 (quoting TAM at § 3.10(1)). Nothing in the quoted sections of the TAM supports plaintiff's argument that defendant had a duty to provide accommodation to allow plaintiff to perform his position at a superior level.

Plaintiff also cites several cases for the proposition that an employer must provide reasonable accommodation beyond what is needed to perform the essential functions of the job. However, none of the cases are on point.

In *Vollmert v. Wisconsin Dep't of Transp.*, 197 F.3d 293, 297–98 (7th Cir. 1999), the court held that the employer was obligated to provide reasonable accommodation in the form of additional computer training for the plaintiff when the use of the particular computer system was an essential function of the plaintiff's job. The case does not hold that the employer had to provide reasonable accommodation to the plaintiff to enable to perform anything beyond the job's essential functions.

In *Branson v. West*, No. 97 C 3538, 1999 WL 311717 (N.D.Ill. May 11, 1999), the reasonable accommodation of a service dog would have allowed the employee to better perform the essential functions of her position. Notably, however, the service dog was the only accommodation to address a certain part of the plaintiff's disability. Thus, although the plaintiff was able to perform the essential functions of her position without the service dog, doing so would have caused her to experience continued deterioration of her body. The employer was obligated to accept a service dog.

In contrast to *Branson*, plaintiff here offers no evidence that the provision of any of the items on his "wish list" would prevent his condition from worsening. Rath-

er, he simply asserts that the items would have enhanced his performance.

In *Nawrot v. CPC International*, 259 F.Supp.2d 716 (N.D.Ill.2003), the court addressed whether an employer was required to provide a reasonable accommodation to a diabetic employee of taking breaks to monitor and maintain his blood sugar levels. The employer failed to provide the accommodation and in litigation, the employer argued that it had no duty to do so because the plaintiff did not require the accommodation to perform his essential job functions. *Id.* at 719. The court held that it could not say, as a matter of law on summary judgment, that the employee did not need the breaks to perform his job functions. *Id.* It noted that without the accommodation, the employee might collapse and then be unable to perform his essential job functions. *Id.* Alternatively, the court addressed the issue of an employee "who needs an accommodation to live regardless of his essential job functions." *Id.* at 726. The court explained that

> [t]o hold that a person with potentially life threatening diabetes is not entitled to accommodations so that he may monitor his blood sugar levels would force diabetics like [the plaintiff] to choose between working while risking physical harm and death, or unemployment. The ADA was created to prohibit placing disabled persons in this position.

*Id.*

The holding in *Nawrot* was that on summary judgment, the court could not conclude that the requested accommodation was unnecessary to the performance of the job's essential functions. Thus, *Nawrot* does not assist plaintiff here. Even considering the alternative discussion in *Nawrot*, plaintiff makes no attempt to show that his requested "wish list" accommodations were necessary for him to live or put him in the position of choosing between his job with a risk of physical harm, or unemployment.

None of the law cited in plaintiff's supplemental memorandum supports his position. The language most on point is from a concurring opinion in the First Circuit where the judge explained that while the plaintiff's disability is grounds for accommodation under the ADA, it did not entitle the plaintiff to changes in work conditions that would improve his performance. *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 110 (1st Cir.2005) (Howard, J. concurring).

Accordingly, I recommend granting defendant's summary judgment motion as to the reasonable accommodation claim, both as to Oregon and federal law. *E.g., Spicer v. Cascade Health Servs., Inc.*, No. CV–03–6377–TC, 2005 WL 2211097, at *5 (D.Or. Sept. 9, 2005) ("Oregon laws on disability discrimination are to be construed in a manner consistent with the federal ADA.").

## II. Discrimination Claim

Ninth Circuit cases apply the *McDonnell Douglas* burden-shifting framework to disability discrimination cases. *E.g., Snead v. Metropolitan Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093 (9th Cir.2001) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Although Oregon courts analyzing disability claims under Oregon law have rejected the *McDonnell Douglas* burden-shifting approach, *see Callan v. Confederation of Or. Sch. Adm'rs*, 79 Or.App. 73, 76–78, 717 P.2d 1252, 1254 (1986), it is nonetheless used for assessing Oregon employment discrimination claims brought in federal court. *See Snead*, 237 F.3d at 1091–93 (holding that *McDonnell Douglas* burden shifting approach and not Oregon prima facie case rule applied to Oregon claims in federal court on diversity jurisdiction); *Morgan v. New Horizon*

*Comm'ns*, No. CV–03–851–HA, 2005 WL 326966, at *3 (D.Or. Feb. 9, 2005) (relying on *Snead* to apply *McDonnell Douglas* burden shifting analysis rather than Oregon prima facie case rule, to supplemental state claim in federal court where primary jurisdiction was established by federal question jurisdiction).

As set out under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination. To establish a prima facie case of discrimination in violation of the ADA, a plaintiff must prove that he or she is disabled, is qualified, and that he or she suffered an adverse employment action because of the disability. *Snead*, 237 F.3d at 1087.

Once a prima facie case is presented by the plaintiff, the burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Snead*, 237 F.3d at 1093. The plaintiff is then afforded an opportunity to demonstrate that the employer's proffered reason was pretextual, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Chuang v. University of Calif.*, 225 F.3d 1115, 1124 (9th Cir.2000).

Defendant does not seriously argue that plaintiff cannot establish a prima facie case. Defendant concedes plaintiff was disabled, he was qualified for his position, and he suffered an adverse employment action. To show that his termination was because he is disabled, as he is required to do as part of his prima facie case, *Allen v. Pacific Bell*, 348 F.3d 1113, 1114 (9th Cir. 2003) (prima facie case of disability discrimination requires the claimant to show that his employer terminated him because of his disability), it is sufficient for plaintiff to show that non-disabled Solutions Engineers were retained while he, a disabled Solutions Engineer, was laid off. *See Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 659 (9th Cir.2002) ("The amount of evidence that must be produced in order to create a prima facie case is very little"; inference may be established by showing that others not in his protected class were treated more favorably) (internal quotation and brackets omitted).

Plaintiff does not seriously contend that defendant has not met its burden to produce evidence of a legitimate, nondiscriminatory basis for its termination decision. Courts have recognized that a downturn in business is a legitimate, nondiscriminatory reason for terminating an employee's employment as part of a reduction in force. *Id.* at 661 (seasonal downturn in business is legitimate, nondiscriminatory reason for terminating employment); *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1295 (9th Cir.2001) ("reduction in force constituted a legitimate, non-discriminatory reason for terminating [employee]") (Wardlaw, J., concurring in part, dissenting in part).

■ The dispute between the parties arises in the context of the third *McDonnell Douglas* question—whether plaintiff has sufficient evidence to create a question of pretext. Plaintiff relies on circumstantial evidence to show pretext. Such evidence must be both specific and substantial to overcome the legitimate reason set forth by the employer. *Aragon*, 292 F.3d at 659.

Circumstantial evidence "can take two forms." *Coghlan v. American Seafoods Co. LLC*, 413 F.3d 1090, 1095 (9th Cir. 2005). The plaintiff can make an affirmative case that the employer is biased by relying on statistical evidence. *Id.* Or, "the plaintiff can make his case negatively, by showing the employer's proffered ex-

planation for the adverse action is 'unworthy of credence.'" *Id.* (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089). As the Supreme Court explained in *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." Moreover, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148, 120 S.Ct. 2097.

Defendant argues that plaintiff has not sustained his burden of establishing pretext. Defendant contends that plaintiff's only evidence of pretext is his subjective belief and speculation that discrimination must be involved. Defendant contends that plaintiff relies only on generalizations, personal beliefs, and opinions. Defendant further contends that plaintiff can point to no evidence of discriminatory bias or motivation and no reason to disbelieve or discredit defendant's articulated reason for selecting him for layoff. Thus, he cannot show that the articulated reason was pretextual and summary judgment for defendant is appropriate.

In response, plaintiff argues that defendant's evidence regarding its layoff and decisionmaking process is not credible and thus, plaintiff satisfies his burden of showing pretext sufficient to defeat summary judgment. For the reasons explained below, I disagree.

Plaintiff first contends that because defendant cannot substantiate or adequately explain the various steps in its layoff process, defendant's reliance on that process is not believable. Plaintiff suggests the following: 1) defendant cannot explain the process by which the evaluation criteria were selected; 2) the document referring to the criteria was created after the fact; 3) the spreadsheet showing the rankings based on the evaluation of the criteria is barely legible and thus shows that it was created after the meeting in which the rankings were determined; 4) the spreadsheet was created by an unknown person; 5) the spreadsheet was subject to manipulation; and 6) defendant cannot explain communications about the ranking or the manipulation of the ranking after the meeting.

Plaintiff grossly overstates the evidence or draws unsupportable inferences from the record. Sibley clearly explained that the evaluation criteria were taken from the performance criteria used on regular performance evaluations. Sibley Depo. at pp. 28–32. Sibley made the decision to use the regular performance evaluation criteria, in conjunction with Parkinson. *Id.* Additionally, Beck stated that the criteria used for the layoff decision were the ones used in the past for performance appraisals. Beck Depo. at p. 55.

Sibley could not remember whether her communication with Parkinson was in person, by telephone, or email. Sibley Depo. at pp. 28–32. Parkinson testified that although she could not remember a specific email, she thought there would have been an email relative to the development of the criteria. Parkinson Depo. at pp. 50–54. She remembered seeing the proposed criteria. *Id.* She was unable to recall whether she made specific suggestions about particular criteria being removed or other criteria added. *Id.*

The evidence cited by plaintiff does not show that defendant is unable to explain the process by which criteria were developed for evaluation of the Solutions Engineers in preparation for the layoff. Rather, it shows that Sibley developed evaluation criteria based on those normal-

ly used in performance reviews and that Parkinson reviewed the criteria, although she cannot remember if she simply reviewed the criteria or actually made specific suggestions regarding the criteria.

The evidence also does not show that the document listing the evaluation criteria was created after the fact. Sibley states that she had a hand in creating the actual document listing the evaluation criteria, but she could not remember if she was its sole creator, who actually keystroked the document, or when it was actually created. Sibley Depo. at p. 39. Parkinson states that she did not know of a document describing the factors to be used in determining the ranking which existed before the ranking took place. Parkinson Depo. at pp. 54–55. She also stated that Deposition Exhibit 12 [3], which is referred to as a set of criteria, could be inclusive of the summary of other criteria which would have been used to assess team members, but, she herself would not know what to make of it. *Id.*

Sibley's testimony is simply that she cannot remember when the actual criteria evaluation document was created or who keyboarded it. Parkinson's testimony indicates that a separate document listing the evaluation criteria may not have existed independently of the document showing the rankings according to those criteria. Neither witness's testimony shows that the actual evaluation criteria themselves were created after the rankings or after the terminations.

Plaintiff contends that because the spreadsheet showing the rankings based on the CRM Directors' evaluation of the criteria is barely legible, it was created after the meeting in which the rankings were determined. I see no factual or other basis for such an inference.

The spreadsheet is attached to Sibley's Declaration. Defendant has represented that it provided plaintiff its best available copy. While some of it is blurry, most of it is legible. It is inaccurate to describe it, as a whole, as barely legible. Moreover, there is simply no correlation between the document's legibility and the timing of its creation.

There is no support for the inference plaintiff wishes to draw from plaintiff's assertion that the rankings document was created by an unknown person after the meeting in which defendant ranked the Solutions Engineers and made selections for layoff. Sibley's testimony is that after the evaluation criteria were developed, each CRM Director evaluated his or her team members against the criteria, following which the results were consolidated. Sibley Depo. at pp. 50–54; *see also* Sibley Declr. at ¶ 10 ("Each Director rated his or her team members based upon the Director's experience working with the employee and also based upon input from Account Executives."). Her testimony shows that the rankings document was created either during or after the meeting she held with the CRM Directors regarding the rankings and layoff decision. Sibley Depo. at pp. 37, 38, 48. While it is accurate to state that she does not remember who actually keystroked the document, it was clearly the product of the information discussed by Sibley and the CRM Directors. There is nothing in the record to support plaintiff's allegation of manipulation.

Parkinson testified that she likely sent an email to corporate counsel, with copies to other Human Resources staff, that was the "output" of the ranking process. Parkinson Depo. at pp. 55–56. She could not recall the exact document or the source of the document. *Id.* She opined that she

---

**3.** This exhibit does not appear to be in the     summary judgment record.

would likely have gotten back to Sibley after legal review and evaluation of the proposed rankings. *Id.*

While some of plaintiff's assertions are technically accurate, for example it is unknown who actually keystroked the rankings document, the inferences plaintiff attempts to draw from the evidence are exaggerated and not supportable. Plaintiff wishes to create the impression that there was no process at all and that the criteria and rankings were made up after the termination decisions were complete, in an after-the-fact attempt to cloak an illegitimate process with legitimacy.

But, even reading the evidence in a light most favorable to plaintiff, the evidence shows that Sibley, and possibly her managers, developed evaluation criteria based on criteria normally used in performance reviews, and that Parkinson reviewed the criteria and may have made specific suggestions regarding the criteria. While it is possible that a separate document listing the criteria alone may not have existed (indicating that the proposed criteria were communicated via email as Parkinson suggested), the undisputed facts are that the evaluation criteria were developed before the CRM Directors undertook the rankings.

Next, Sibley charged her CRM Directors with using the criteria to evaluate their respective Solutions Engineers, after which the Directors and Sibley had a meeting. It is accurate to state that memories as to whether the meeting was by phone or in person differ, as do memories of who exactly attended or participated. But, there is no dispute among defendant's witnesses that a meeting took place where the Directors reported their individual evaluations to Sibley, and together, they ranked the Solutions Engineers.

Someone created the spreadsheet showing the rankings. Although Sibley did not know who actually keyboarded it, there is no dispute that the spreadsheet was a product of the meeting among Sibley and the CRM Directors. The evidence indicates that the proposed rankings were forwarded to Parkinson who reviewed it and then apparently had it approved by defendant's legal department.

While the law allows a plaintiff to avoid summary judgment when he or she is able to show that the defendant's explanation for its actions is unworthy of credence, the Ninth Circuit, as noted above, requires that circumstantial evidence in support of a showing of pretext be specific and substantial. The evidence plaintiff relies on here, to the extent it is not overstated, does not meet that standard.

Plaintiff does not cite a single case, and I have not found one, showing that a lack of detail regarding some aspects of a termination decision alone constitutes specific and substantial evidence of a lack of credibility. A Ninth Circuit case holding that a genuine issue as to pretext was shown by the absence of *any* documentation confirming that a company hiring freeze was in place during the relevant time period, is distinguishable. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1123 (9th Cir.2004). There, the court noted, the fact that a company as large as GTE did not have a single memorandum, meeting notes, or other evidence of the alleged hiring freeze or financial difficulties leading to the alleged hiring freeze, provided adequate circumstantial evidence that the hiring freeze did not exist. *Id.*

In contrast to *McGinest*, defendant here has testimony from several witnesses, supported by documentation, of the process by which the Solutions Engineers were chosen for layoff. While certain details of the process are ambiguous or contradictory, they are of minor relevance (e.g. whether the meeting was in person or by conference call) and in any event, they do not

undermine the existence of the process as described and documented.

Moreover, the *McGinest* court noted that there was additional circumstantial evidence of pretext given the defendant's "permissive response to harassing actions undertaken by coworkers and supervisors, combined with the absence of black supervisors and managers in the workplace[.]" *Id.* at 1123. As discussed below, no additional circumstantial evidence is present here.

Plaintiff's second pretext argument is that because defendant did not consider various qualifications and skills in analyzing his work performance in the rankings process, defendant's reliance on the layoff decisionmaking and ranking process is not believable. Again, plaintiff overstates the evidence.

Plaintiff contends that his qualifications, work performance, operational CRM skills, analytical skills, knowledge of R/3, team skills, 2002 revenue year to date, 2001 revenue, and his last three months' productivity, were not considered in the meeting in which the termination selections were made. Furthermore, he states, defendant cannot identify sources of oral input it might have received, nor produce any written documents supporting the claimed numerical values assigned to plaintiff. Finally, he notes that his performance review was not considered.

Sibley testified that she could not remember anything specific about plaintiff being discussed in the meeting with the CRM Directors. But, she explained, she was sure there were discussions. Sibley Depo. at pp. 34–35, 40, 47.

At one point in his deposition, Beck was unable to recall any specific discussion of plaintiff during the CRM Director meeting with Sibley regarding the "operational CRM expertise" or the "analytical CRM expertise" evaluation criteria. Beck Depo. at pp. 60–61, 63. Beck explained the dif-ferences between operational CRM expertise and analytical CRM expertise. *Id.* at pp. 60–63. Later in the deposition, he described how plaintiff's operational CRM expertise was evaluated. *Id.* at pp. 74–75. Beck stated that he evaluated plaintiff's "operational CRM expertise" by referring to "multiple data points," by observation, and by input from other solution engineers that plaintiff worked with and other account executives he worked with. *Id.* at p. 74. Beck specifically recalled considering a deal plaintiff had been working on at the time when Beck had to assign a different solution engineer to do the demo work because plaintiff was unable to do it. *Id.* at p. 75.

Beck stated that he did not review plaintiff's resume and did not review any performance reviews for plaintiff in connection with the rankings conference. *Id.* at pp. 79–80. He explained that in regard to plaintiff's performance over the previous quarter immediately preceding the rankings and layoff determinations, the CRM Directors would have had the same information for plaintiff as they had for all the other Solutions Engineers. *Id.* at pp. 60–61. He further explained that the last three months' productive utilization was calculated using a basic math formula and whatever number was "spit out" by that formula was assigned to that criterion. *Id.* at pp. 73–74. Nothing else went into plaintiff's evaluation on that factor. *Id.* at p. 74.

The ranking document shows that plaintiff was evaluated in every category except 2001 Revenue and 2002 Year to Date Revenue. Exh. A to Sibley's Declr. But, plaintiff was not hired until mid-November 2001 so it is unlikely he would have generated revenue in 2001. He provides no affirmative evidence of producing revenue in 2001. Without any contradictory evidence in the record, it is apparent that

plaintiff had not yet generated any revenue in 2002 at the time the rankings were determined. Although plaintiff states that he had a "huge pipeline of work in progress[,]" he fails to show that the absence of any 2002 Year to Date Revenue is inaccurate. Pltf Declr. at ¶ 20.[4] And, although it is true that Beck did not review plaintiff's resume or performance evaluation in determining the rankings, plaintiff fails to show that Sibley and the CRM Directors reviewed resumes or performance evaluations of other Solutions Engineers.

Again, the facts upon which plaintiff relies in an attempt to undermine the credibility of defendant's layoff process, do not show a lack of credence. The undisputed evidence is that neither Beck, nor Sibley could recall specifically discussing some of the evaluative criteria in regard to plaintiff during the CRM Director meeting in which the rankings were determined. The evidence does not show, however, that plaintiff's relevant skills and qualifications were never evaluated or were evaluated differently than any other Solutions Engineer. The evidence upon which plaintiff relies, is not, when viewed in context with the other evidence, specific and substantial evidence to show that plaintiff was not actually evaluated according to the criteria.

Finally, although plaintiff touts his performance and suggests it was superior to the performances of other Solutions Engineers, he fails to create a genuine issue as to pretext with this evidence. In his declaration, plaintiff notes that he was generating sales in an area previously undeveloped, he had a "huge pipeline" of work in progress, and was involved "in more deals than virtually all the other Solutions Engineers." Pltf Declr. at ¶¶ 19, 20. He states he was heavily engaged in sales activities, heavily utilized, and devoted a high percentage of his time to sales work. *Id.* at ¶ 21. Even before training was over, he was "brought into deals right and left." *Id.* at ¶ 22. He recites that he was "certainly of highest demand" within his group, and perhaps out of all the Solutions Engineers. *Id.* at ¶ 23. He indicates that the deals he was working on totaled from $8 to $12 million, a fact worth noting he says, because in only six months, his "deal total" approached the $14 million in deals produced by a long term employee. *Id.* at p. 25.

Plaintiff's declaration offers nothing more than his own self-serving statements about his job performance and value to the company. He does not show that less qualified, non-disabled Solutions Engineers were retained. He does not produce evidence of the performance of other Solutions Engineers to show that he was somehow treated less favorably because of his disability and thereby cast doubt on defendant's articulated legitimate, nondiscriminatory motive. Moreover, the Ninth Circuit has held that "an employee's subjective personal judgments of his competence alone do not raise a genuine issue of material fact." *Aragon*, 292 F.3d at 660 (internal quotation and brackets omitted).

---

4. Moreover, plaintiff fails to support his assertion of work in progress with any empirical support. Exhibit E to plaintiff's declaration "are copies of a small portion of my retained email traffic concerning my involvement in deals." Pltf Declr. at ¶ 23. These records, about 3/4 of an inch thick, are in no particular order. Plaintiff offers no information to explain the significance of the records. For example, plaintiff gives no information about the names or size of various "deals," or what the emails show regarding the nature of plaintiff's involvement in a deal. It is not the Court's job to thumb through such records in an effort to discern if or how they support plaintiff's assertion. Thus, plaintiff offers no valid support for his declaration statement that he had a "huge pipeline of work in progress."

Accordingly, plaintiff fails to produce specific and substantial circumstantial evidence of pretext to create a genuine dispute about defendant's articulated motive. Defendant's motion should be granted.[5]

## CONCLUSION

Defendant's motion for summary judgment (# 22) should be granted.

## SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due April 4, 2005. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

If objections are filed, a response to the objections is due April 18, 2006, and the review of the Findings and Recommendation will go under advisement on that date.

IT IS SO ORDERED.

**5.** In his Concise Statement of Facts, plaintiff notes two allegedly derogatory comments purportedly made to or about him. Pltf CSF at ¶ 10. Although he does not rely on these comments in his arguments opposing defendant's motion, they bear mentioning.

The undisputed evidence in the record is that Leschinsky, after hiring plaintiff, told Sibley that plaintiff had been a "Munchkin" in the film "The Wizard of Oz." Sibley Depo. at p. 6. Sibley interpreted the comment as Leschinsky describing plaintiff as an interesting person because of that fact. There is no evidence that either Leschinsky or Sibley, or anyone else, referred to plaintiff as a Munchkin at any time. Moreover, Leschinsky was terminated before the layoff process began.

Additionally, plaintiff recites in his declaration that upon first meeting Sibley, she mentioned to plaintiff that she had heard that he had been an "Ewok," a character in various "Star Wars" films. Pltf Declr. at ¶ 7. In his declaration, plaintiff states he found the comment offensive and dismissive of his accomplishments. *Id.* But, in his deposition testimony, he acknowledged that Sibley had a friendly demeanor and tone when talking to him about his experiences. Pltf Depo. at pp. 49–50. Moreover, plaintiff actually was an Ewok in three Star Wars movies. *Id.* A web site created by a friend of plaintiff's shows a picture of plaintiff in an Ewok costume, without the Ewok head. *Id.* Plaintiff does not object to the picture.

Given the undisputed evidence regarding the comments and the context in which they were made, the comments fail to raise a genuine issue of fact regarding any discriminatory motive by defendant.